Brian K. Jackson (15296)
Brian K. Jackson, LLC
341 S. Main St. Suite 500
Salt Lake City, Utah 84111
Phone: (801) 441-8922
Fax: (801) 534-1948
brianj@bjacksonlaw.com

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| Michael Calnimptewa,<br>    Plaintiff,<br><br>v.<br><br>Swift Transportation,<br>Gallagher Bassett,<br>Mohave Transportation Insurance Company.<br>    Defendants. | **COMPLAINT**<br><br>Civil No.: 2:19-cv-00044-DBP<br><br>Judge:<br><br>Magistrate: Dustin B. Pead<br><br>***Jury Trial Requested*** |

Plaintiff, Michael Calnimptewa, by and through his attorney of record, Brian K. Jackson of Brian K. Jackson, LLC in the Utah Labor Division, in the United States District Court for the District of Utah, Central Division, hereby allege and complain the following facts and requests this court that compensation for damages that have been incurred thereby be entered based on the foregoing legal causes of actions against Defendants:

### PARTIES, JURISDICTION, VENUE

1.     Plaintiff, Michael Calnimptewa is a former employee of Swift Transportation "Swift" until he was injured on or about March of 2017 on the worksite and was ultimately terminated on or about May of 2017. He currently resides in Phoenix, Arizona with the intent to permanently stay there.

2.      Defendant, Swift Transportation Co. LLC, a Delaware Corporation, hereinafter, "Swift" is a transportation company that deals in transportation freight on Class 8 Rigs across the United States and is the former employer of Michael Calnimptewa whose headquarters are located in 2200 S. 75th Avenue Phoenix, AZ 85043. The company of which employees over 39,000 employees that are commercial drivers.

3.      Defendant, Mohave Transportation Insurance Company, an Arizona corporation, is a wholly-owned insurance captive subsidiary, and owner-operators occupational-accident, physical damage, and other types of insurance. The company charges Swift for insurance claims reimbursements, payroll, legal fees and management fees and administered to Mr. Calnimptewa's claims through their agent Melanie Malkemus through apparent authorized authority as the work injury claims examiner.

4.      The "company" refers to both the actions of Swift and Mohave as it relates to the claims described below. The company of which acted through apparent or authorized authority on behalf of Swift to manage insurance claims as it related to Swift Employees. Also, given the control that Swift has over Mohave, as to determining and approving insurance claims as it relates to its employees, Mohave and its actions were actions that demonstrate a mere agency to Swift, instead of an independent company. Without the employees of Swift, the company would not be able to manage the claims. Also, without the approval of Swift as to the claims, in that Swift is the 100% owner of the company, they could not pay any claims without such company authorization.

5.      Defendant, Gallagher Bassett Services, Inc. and or Ace American Insurance Company, provides risk management services to clients and was the insurance company that managed Mr.

Calnimptewa insurance claim whose principal headquarters are located at Two Pierce Place Itasca, IL 60143-3141, United States.

6.    Subject matter jurisdiction is proper pursuant to 28 U.S.C. Section 1331 with a matter arising under a federal law related to claims under the Americans with Disabilities Act of 1996 and the Employee Retirement Income Security Act of 1974 .

7.    Personal jurisdiction is proper as the incident in question occurred in Salt Lake County, Utah through an employment contract that was primarily executed within the state of Utah of Swift Transportation and Mohave Insurance while working in the course and scope of their employment. Swift Transportation and Mohave Insurance have also thrust themselves into the stream of commerce within the state of Utah with a hub within the state of Utah for its Class 8 rigs and agents and employers that work with Swift Transportation in fixing, assigning, delegating and dealing with employment matters within the state of Utah. The area of which Mr. Calnimptewa primarily communicated to the company with and the area of which his car was parked when the incident alleged herein arose and the company benefited from the laws and policies within the state of Utah owning and controlling their products and benefitting from the laws and policies within the state of Utah as an active participant in the stream of commerce sells its vehicles within the state with the intent of Utah residents owning and controlling their products and benefitting from the laws and policies within the state of Utah as an active participant in the stream of commerce including registering their business with the state. They also have an active presence within the state and has a location where they sell their products and fix their rigs for their clients within the state of Utah if any mechanical issues arise as to the use of their products. The actions and involvement of which also invokes Utah's long-arm statute.

8.     Personal Jurisdiction is proper over Gallagher Bassett in that they knew or reasonably should have known that one of their insured would have claim arising out of the state of Utah as it related to his or her employment with Swift Transportation and a potential worker's compensation claim and benefits from the laws and rights within the state of Utah. Mr. Calnimptewa's worker's compensation claim was also filed within the State of Utah and as a result, both entities have also consented to jurisdiction within the state of Utah related to Mr. Calnimptewa's claims as well as his claim for workplace discrimination with the Utah Labor Commission with Swift and the actions of which stem from that worker's compensation claim with his primary place of contact during his employment located in Salt Lake City, Utah.

9.     The actions of which are alleged are intentional actions and survive any claim as it relates to the exclusive remedy claim as to worker's compensation and are claims that are beyond any claim or settlement related to Mr. Calnimptewa's claim for workers compensation.

10.     Venue is proper as the matter and incidents alleged herein arose within Salt Lake County, State of Utah from an employment contract entered into and executed with Mr. Calnimptewa and the contract of which was handled and executed with supervisors of Mr. Calnimptewa were located within Salt Lake County, Utah.

11.     Mr. Calnimptewa filed a complaint with the EEOC and the Utah Labor Division under case number B7-0528 and EEOC number 35C-2017-00528 for discrimination based on his disability and unlawful retaliation within 180 days of the alleged incidents that occurred on or after March 26th, 2017. Thereafter, Mr. Calnimptewa obtained a right to sue notice to file this action within this venue on or about November 2nd, 2018 and has filed this action within the 90 days notice.

## GENERAL ALLEGATIONS

12.     This case involves Plaintiff, Michael Calnimptewa, who was a commercial truck driver for Swift Inc. Mr. Calnimptewa was an employee of Swift Transportation before March 27th, 2017 and was about 58-years old that time. *(Exhibit A)[1]* Swift Transportation is a company that transports freights and goods for (*See Declaration of Michael Calnimptewa at 1) (Exhibit A)*rious corporations and entities through semi-truck across the United States. Their principal headquarters are located in Salt Lake County, Utah. *(Exhibit A)*

13.     Mr. Calnimptewa was hired by Swift Transportation as a CDL truck driver to transport freight through semi-truck across the United States. He had worked under that position for over 11 years. He was an excellent driver with no prior disciplinary action and was on a program given his season as a driver to obtain additional work benefits due to his work history. *(See Declaration of Michael Calnimptewa at 1) (Exhibit A) (His work duties are described in Exhibit O)*

14.     Mr. Calnimptewa was in an accident arising out of and in the course of his employment when the wind picked up and the semi-truck door slammed onto his arm and he fell 4 - 5 feet onto the concrete, sustaining injuries to his back, shoulder, knee and elbow which the company admits. *(Exhibit J at 2) (Exhibit C) (Exhibit G at 2) (Exhibit K) (See Declaration of Michael Calnimptewa at 1, 2, 3)*

15.     Mr. Calnimptewa was sweeping the back of the truck out after delivering a load in Las Vegas, Nevada. *Id.* The company admitted that he sustained a work-related injury from falling off the back of his truck from a wind storm in their report. *(Exhibit A, K)*

16.     Despite this, and contrary to federal policy for truck drivers, he was forced to drive from

---

[1] Exhibits and documents referenced are exhibits and documents used by Mr. Calnimptewa in his worker's compensation action.

the place of the injury, (Las Vegas) to Cedar City, to California. The company never reported the work injury to the labor division. The company never denied the work injury claim. He was told that he had committed to the load and that he had to take it to California with threats of termination. He was also told that if he needed medical attention in California, that the company could leave him stranded there.

17.    He incurred a meniscus tear to his knee which required arthroscopic surgery August 13th of 2017 and was not able to perform his job-related duties up to or after his surgery due to the pain and his inability to walk. *(Exhibit E, I, J)*

18.    In order to drive a Class 8 rig, Mr. Calnimptewa needed a Commercial Drivers License. The license of which requires medical clearance if one's limbs have been impaired prior to driving again. Mr. Calnimptewa was not allowed to seek medical attention in Las Vegas. The company also never sought medical clearance for him to drive once he indicated to them impairment of his knee after he reported the injury in violation of DOT policy and company policy. *(Exhibit B) ( See C.F.R. 49 B III B §392.3; 391.35; 391.41).*

19.    Mr. Calnimptewa as a result, had to drive on his hurt knee and back and elbow all the way to Stockton California, without medical attention or pain management. Mr. Calnimptewa was told to drive to California (542 miles from Las Vegas) or return to West Valley in threats of termination from his job and in threats of stranding him with his injury when he talked to Swift regarding his injury. *(Exhibit B) (Declaration of Plaintiff 3, 4, 5)*

20.    When he arrived to Stockton, he went to a doctor to obtain pain management. He told the company of his visit to the doctor.

21.    Despite this, the company told Mr. Calnimptewa what doctors to go to, cancelled

appointment, talked to his doctors in violation of HIPPA, claimed that he was fit for light duty despite having certification per federal regulation, terminated him as well as his medical benefits, left him homeless and destitute and on his own in figuring out how to fix the problem himself.

22.     The company failed to report the injury to the Department of Labor when it occurred.

23.     The company and the insurance company never denied Mr. Calnimptewa's worker's compensation claim.

24.     The company noted that that a worker's compensation claim was filed on behalf of Mr. Calnimptewa on March 31st, 2017 and he would not return to work until March 31st, 2018. *(Exhibit A)*

25.     On July 24th, 2017 Doctor Noback authored a note stating, "Mr. Calnimptewa sustained injuries to his back, left knee, and right elbow while at work … . He is still being treated and, for the foreseeable future, will be unable to return to his previous occupation as a truck driver due to physical limitations secondary to his injuries." *(Exhibit H)*

26.     It was also noted on May 1st, 2017 that he could not return to work until he saw a specialist. *(Exhibit D at 3)*

27.     The company admitted that he sustained a work-related injury from falling off the back of his truck from a wind storm in their report. *(Exhibit A, K)*

28.     Mr. Calnimptewa reported the injury to the company when it occurred. *(Exhibit A)*

29.     The company told Mr. Calnimptewa not to seek treatment. *(Declaration of Plaintiff 3, 4, 5)*

30.     The company made Mr. Calnimptewa go to their own Worker's Compensation doctors for the injuries at U.S. Health Works on April 1st, 2017 with an initial expected return to work

date of April 28th, 2017. *(Exhibit C)*

31.     Three weeks after the injury, Mr. Calnimptewa was called by Kim Bosler from Gallagher Bassett for a phone interview and Mr. Calnimptewa shared the exact same story he initially shared with Melanie Malkemus and his Driver Manager Claire. He never heard from the Gallagher Bassett after that directly and was unable to get information from them when he tried to reach out to them. They never denied his worker's compensation claim.

32.     The company made Mr. Calnimptewa cancel his follow-up appointment on April 6th, 2017 with U.S. Health Works and physical therapy appointments. *(See Declaration of Plaintiff at 9)*

33.     The company wanted Mr. Calnimptewa to return back to Pocatello, Idaho to obtain the physical therapy he needed and took money out of his paycheck to pay for a bus ticket. Mr. Calnimptewa in his condition and with all of his belongings could not make the trip. A fellow trucker was gracious to Mr. Calnimptewa and allowed him to stay in his home nearby.

34.     Thereafter, he started living with his in-laws and had to borrow money off them for his living expenses who also lived nearby and paid them $1000 for room and board. He did not receive any compensation benefits during this time and there was no denial of his benefits at this time.

35.     Mr. Calnimptewa never received the medical attention he needed until the company finally scheduled another appointment on May 1st, 2017 but for the emergency room he attended at California Medical Center due to the pain. He was prescribed pain medication at that time but was unable to fill the medication due to lack of funds. He had no access to the insurance information to bill workers compensation. When he attempted to contact the insurance company,

he was told that he could not contact the insurance company directly and had to go through the company. *(See Declaration of Plaintiff at 10 - 13) (Exhibit D)*

36.     Melanie Melkumus talked to U.S. Health Works doctor immediately prior to Mr. Calnimptewa's visit to U.S. Health Works on May 1at. The company denied such conversation despite it being clearly stated in the doctor's note that it occurred. *(Exhibit D)*

37.     This is a violation of the Health Insurance Portability and Accountability Act in talking to a medical professional regarding protected health information of Mr. Calnimptewa as well as doctor-patient privileged information.

38.     Thereafter, despite Mr. Calnimptewa describing the pain he was in, the doctor would only prescribe tylenol and it is Mr. Calnimptewa belief that the conversation the company had with his doctor deterred the doctor from determining if Mr. Calnimptewa was in serious pain and did not have my prior medical records from my visit to the ER. *(Exhibit D)*

39.     The doctor at the visit admitted that Mr. Calnimptewa showed no improvement from his original injuries. It also noted that if there was nothing that could be modified for his work duties, he could not return to work. However, there was no specific return to work release and Mr. Calnimptewa had not talked to the doctor about returning to work or duties he could perform under light duty *Id.*

40.     That same day, Mr. Calnimptewa had to admit himself into the Emergency Room at Lodi Medical Hospital and received the necessary pain management he needed. The doctor there noted that he could not return to work until he saw a specialist for his injuries. *(Exhibit D at 3)*

41.     The company wanted Mr. Calnimptewa to have an MRI in Boise, Idaho to save money. Which was nowhere near where he was at the time and 5 hours away from his home. Thereafter,

an MRI was setup in California of which was later cancelled.

42.     During this time he was suffering from pain on a scale of 1 - 10 of 8 all the time and had to lay down in bed to keep the pain level down. He could not touch the sky with his left hand. When he tried walking on his knee it was wobbly like it was rubber and all of the pain shot up to his pelvis. He had to lean on his other leg to get the pressure off and had to constantly watch it or it would buckle.

43.     The company paid Mr. Calnimptewa benefits for his work-related accident checks of $3,574.86, $736.03 from their own account and another check for $736.03 from Gallagher Basset. The claimed to have paid medical bills to Lodi Medical Hospital and to U.S. Health Works for his work-related injury but his visit to Lodi Medical hospital was sent to collections. *(Exhibit N at 3)*

44.     Mr. Calnimptewa was not in a position to return to work medically on May 10th, 2017 since the work-related accident given his tear and back pain he was suffering. *(See Declaration of Plaintiff 13 - 16)*

45.     Mr. Calnimptewa was not in a position to return to work up to his surgery in August of 2017. *(See Declaration of Plaintiff 13 - 16)*

46.     Despite, this the company claimed that in light of his most-recent medical note, of which Mr. Calnimptewa had not provided to the company prior, that he could perform light duty work. Mr. Calnimptewa reached out to the company to explain that he could not work light duty and to inquire what the light duty work required.

47.     The company never communicated to Mr. Calnimptewa what light duty jobs he could do in light of his injuries, he also still did not have a medical certificate that would clear him to

work at that time under federal law. *(Exhibit M) (Exhibit O)*

48.     Mr. Calnimptewa could not perform his expected job duties under his job description as a truck driver on a torn medial meniscus and lower lumbar strain physically and legally. *(See Declaration of Plaintiff 16, 17, 18, 19) ( See C.F.R. 49 B III B §392.3; 391.35; 391.41).*

49.     Mr. Calnimptewa could not drive himself to work in light of his injuries. *Id.*

50.     Mr. Calnimptewa could not work as a truck driver under the medication that had been prescribed to him. *Id.*

51.     On May 22nd, 2017, the company sent a letter to Mr. Calnimptewa claiming that the light duty placement "was in compliance with the work restriction established by your treating physician" without further detail as to the job description, the time or location of the job. It claimed that it was unsuccessful and contacting Mr. Calnimptewa regarding the light duty program and noted that it would proceed to take him off the program "as it could possibly affect your employment with Swift Transportation as well." The letter was signed by Lauranetta Williams the return to work coordinator.

52.     Before and after this letter, Mr. Calnimptewa contacted Swift to inquire what the job duties were for light duty and to explain to them that he could not work in his condition. He called the company and left a message and relayed the same message through counsel to Michael Dyer, the representative for Swift of which he said he would relay the information to the company in a phone conversation as well as through e-mail indicating that he could not return to work until he saw a specialist.

53.     On May 24th, 2017, the company discontinued his medical benefits without advance notice to Mr. Calnimptewa.

54.    On May 31st, 2017, the company despite claiming that he was removed from light duty status, claimed again that he was still on light duty status and that he was "expected to adhere to Swift policies and procedures regarding attendance, timeliness, productivity, communication ect." They claimed they attempted to contact him through counsel and personally and "no one reciprocated. Per Swift policy failure to work the modified light duty position provided, known as "No Call No Show" or lack of communication may result in your separation of employment with Swift Transportation and benefits will be interrupted. Please reach out to me if you have any questions regarding this letter." As a result, the letter noted, "At this time, I will proceed a separation of employment with Swift Transportation as of June, 2017."

55.    There was no mention of the "No Call no Show" policy in the prior letter.

56.    The company terminated Mr. Calnimptewa for the injuries he sustained and discontinued his medical benefits before terminating him and terminated his medical benefits. *(Exhibit M at 5)* *(Exhibit N)*

57.    Prior and after this, Mr. Calnimptewa was suffering from severe depression due to his inability to attend to his medical needs and the pain his was suffering from as well as marital issues in light of the financial situation they were in and Mr. Calnimptewa imposing in on and relying on his in-laws for support. He had feelings of helplessness, hopelessness, anger, frustration, anxiety, stress, general fear, as well as thoughts of suicide. He had a prior medical condition of depression. The incident also caused his wife to separate from him as a result of the incident.

58.    The company scheduled the MRI for Mr. Calnimptewa in Pocatello, Idaho for June of 2017 and then failed to pay for that medical expense which was sent to collections and of which

Mr. Calnimptewa had to pay his own way to attend. *(Exhibit E)*.

59.     Due to the marital issues and inability to pay for his recurring bills, Mr. Calnimptewa did not have a place to live or stay during his injury. As a result, he had to drive down to Arizona with all of his belongings to receive medical assistance with the Hopi Native American Reservation and its benefits to tribal members on or about June or July of 2017l.

60.     The company and insurance company did not schedule a surgery date for Mr. Calnimptewa or a follow-up with the MRI doctor.

61.     When Mr. Calnimptewa finally received proper medical attention for his knee and back injuries in July of 2017, the doctor ordered that he could not work at that time in light of his injuries with his first visit to Mr. Noback. *(Exhibit H)*

62.     After surgery, Mr. Calnimptewa was told that he could not return to work as a truck driver for at least 6 months until he had fully healed. *(Exhibit I)*

63.     The company never paid for the MRI for Mr. Calnimptewa which the scheduled for him in Pocatello, Idaho, hundreds of miles of where his injury occurred.

64.     The company never paid for the surgery for Mr. Calnimptewa, it was paid for with a low-income medical program.

65.     The independent medical examiner from the company noted that Mr. Calnimptewa suffered from a medial tear in the meniscus and that he may have suffered from a lower lumbar strain as well as a lateral epicondylitis. *(Exhibit J)*

66.     Mr. Calnimptewa's back injuries and elbow injuries have not been fully addressed yet. (Exhibit I, J)

67.     His 2012 Subaru Forester was repossessed which he inherited from his parents. He owes

his in-laws $5000 in rent. He has to use food stamps, to pay for electricity and water. He had a friend paying for his phone bill starting in August of 2018. He has been receiving compensation from his church for gas and hygiene. He also received compensation from friends and family members to about $700 as well as room and board to help pay for him at this time and suffered from the same emotional trauma. *(See Declaration of Plaintiff at 24, 25, 26)*.

68.     He continues to suffer from pain due to his knee injury and may require additional surgery as well as back pain. Upon Mr. Calnimptewa's information or belief, the inability to obtain surgery after the surgery and having to continue to walk on his knee due to the actions of the company and dictating and denying his medical visits, made his knee and back injuries worse then they would have had he properly been attended to in Las Vegas he also suffered from additional and unnecessary pain and suffering for the delay as well as unnecessary emotional trauma including when he was able to obtain the proper pain medications due to lack of funds and the company's and insurance company's inability to provide him with the information he needed to bill workers' compensation as well as the company down-playing his injuries and claiming that he would return to work without him still receiving a proper diagnosis and treatment for his initial injuries.

69.     He is still unable to work and may never be able to return to work as a CDL driver or obtain a proper job or have time to pursue a new career given his age and is working toward being qualified for government disability benefits.

**LEGAL CLAIMS**

70.     As a result, Mr. Calnimptewa now brings the following causes of action and incorporates the above facts above into the allegations below:

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

71.     To prove a claim for intentional infliction of emotional distress, Mr. Calnimptewa must prove each of the following elements: Outrageous and intolerable conduct by Defendant and 2. Defendant intended to cause emotional distress or acted with reckless disregard of the probability of causing emotional distress; and  3. Mr. Calnimptewa suffered emotional distress that was caused by Defendant's conduct. *Samms v. Eccles*, 11 Utah 2d 289, 358 P.2d 344 (1961). *(See Amos v. Corp of Presiding Bishop, 594 F. Supp. 791, 831 (D. Utah 1984)) "Outrageous and intolerable" conduct is conduct that offends generally accepted standards of decency and morality or, in other words, conduct that is so extreme as to exceed all bounds of what is usually tolerated in a civilized community. Anderson Development Company v. Tobias, et al,* 116 P.3d 323 *(Utah 2005).*

72.     Mr. Calnimptewa incorporates the language of the causes of action for assault and battery into this cause of action as well.

73.     **Count 1:** Here, Plaintiff alleges that the company intended to cause distress on him when they told him through his supervisor that he had to finish his load to Stockton California after his injury in Las Vegas without federal certification that Mr. Calnimptewa was cleared to drive as a result of the injury and knowledge of his pain and injury. This was conduct that offended the accepted standards of decency and morality when an individual suffers a severe work-site injury that requires medical attention and federal authorization before we can commercially drive again and of which made it so he could not take any medication for the pain.

74.     **Count 2:** Plaintiff alleges that the company intended to cause distress on him when they told him that he had to buy a bus ticket and return home to obtain further medical attention in

light of his injury knowing the seriousness of his injury, his inability to properly walk or drive and the amount of belongings that he had in his truck. This was conduct that offended the accepted standards of decency and morality as it relates to assuring that Mr. Calnimptewa obtained and was able to obtain the proper medical attention and had the ability to travel on the bus in his medical state at the time.

75.     **Count 3:** Plaintiff alleges that the company intended to cause distress on him when they told him to cancel his follow-up doctor appointment in California to his injuries knowing that he suffered an injury that required a follow-up doctor visit and time off of work due to the seriousness of the injury. This was through Ms. This was conduct that offended and went beyond the accepted standards of decency and morality as it relates to Mr. Calnimptewa, his health and medical needs at that time and his ability to be properly diagnosed and recover from his injuries.

76.     **Count 4:** Plaintiff alleges that the company intended to cause distress on him when he was unable to return to his home and was unable to obtain medical attention for his knee and pay for pain prescriptions when he stayed in California in light of the serious injuries he had suffered that the company was aware of. This was conduct that offended the accepted standards of decency and morality as to ensuring Mr. Calnimptewa was able to return in a way that did not disrupt his knee further and he was able to do in a way where he was able to take all of his belonging home as well as their knowledge of the pain that Mr. Calnimptewa was suffering from as a result of his knee injury.

77.     **Count 5:** Plaintiff alleges that the company intended to cause distress on him when the company talked to his doctor prior to his appointment and thereafter the doctor refused to listen to Mr. Calnimptewa's complaints and only prescribed him tylenol despite the pain he was in and

in light of the fact he had to go to the ER for further medical treatment for pain managment thereafter. This was conduct that offended the accepted standards of decency and morality as the conversation violates doctor patient privileges, HIPPA, and Defendant's ability to properly explain and address the issues with the doctor without intervention by the company.

78. **Count 6:** Plaintiff alleges that the company intended to cause distress on him when they attempted to claim that he was able to work light duty, despite his physical condition on a torn knee and the company's failure to determine what specific limitations he had on a specific job duty and intentionally failing to discuss with Mr. Calnimptewa what his duties would be prior to determining whether or not he could return to work or hearing specific complaints of Mr. Calnimptewa regarding his knee. Any duties of which were outside the job description of Mr. Calnimptewa as a CDL driver and he could not continue to work as a CDL driver until he had obtained proper federal medical authorization. This was conduct that offended the accepted standards of decency and morality as Ms. Calnimptewa still needed doctors approval to return to work with the doctor knowing on what conditions he would return to to light duty. This was also in light of the fact that Mr. Calnimptewa did not live in California at was living with his in-laws and had no personal transportation to and from work as his car was in Salt Lake City, Utah nor funds for other travel accommodations to and from work.

79. **Count 7:** Plaintiff alleges that the company intended to cause distress on Mr. Calnimptewa when they terminated his health benefits while he was still an employee of the company and prior to terminating him denying him the ability to seek medical attention knowing that Mr. Calnimptewa was using his private insurance as it was the only means for him to obtain proper pain management. This was conduct that offended the accepted standards of decency and

morality as it made it so Mr. Calnimptewa had no way to address his health condition at that time and start the recovery to return to work, they also terminated his benefits before they terminated Mr. Calnimptewa as an employee further indicating they intended to cancel his health benefits before even determining to terminate him. There was also no justifiable basis to terminate Mr. Calnimptewa as they knew he was not in a condition to drive or work with the condition he was in and could not work under his job duties and was not living in the area they offered light duty to him at that time.

80. **Count 8:** Plaintiff alleges that the company intended to cause distress on Mr. Calnimptewa when they terminated him from his position for failure to attend light duty in light of his injury and knowing it was a worksite injury which left him homeless, destitute and had to borrow money from friends and family and led to the repossession of his vehicle he inherited from his family. This was conduct that offended the accepted standards of decency and morality as the company knew that it was a worksite injury and they had the responsibility of paying for his medical injury related to the injury and the company had intentions of doing so as they had threatened to leave Mr. Calnimptewa stranded when he initially reported his injury.

81. **Count 9:** Plaintiff alleges that  the company intended to cause distress on Mr. Calnimptewa when they wanted Mr. Calnimptewa to obtain and MRI in Boise, Idaho to save money. This was conduct that offended the accepted standards of decency and morality as Mr. Calnimptewa did not leave in Boise Idaho and was over 6 hours away from his home and over 9 hours from where he was and he had now way to accommodate himself financially for such and MRI.

82. **Count 10:** Plaintiff alleges that the company intended to cause distress on Mr.

Calnimptewa when they forced him to seek his own medical attention due the company's failure to do so without health benefits and move all the way to Arizona in order to obtain such attention. This was conduct that offended the accepted standards of decency and morality as the company knew that it was a worksite injury and they were responsible for the injuries and that they had terminated his own health benefits.

83. **Count 11:** Plaintiff alleges that the company intended to cause distress on Mr. Calnimptewa when they did not pay for the MRI bill and other medical bills they had setup or that Mr. Calnimptewa had setup to address his work injures which was conduct that offended the accepted standards of decency and morality as the company was responsible for paying the bill of behalf of Mr. Calnimptewa and the insurance company never denied Mr. Calnimptewa's workers compensation claim. The actions were also conduct that offended the accepted standards of decency as it relates to the fraud and discrimination claims and breach of fiduciary duty claims as the actions created a severe conflict of interest as it related to Mr. Calnimptewa and his health and well-being and their actions were a means to mitigate any liability owed toward Mr. Calnimptewa, the conflict of which discriminated and caused injury to Mr. Calnimptewa. The conflict of which was also fraudulent and deceptive and misleading as to the intent and purpose of the Mohave Insurance. The conflict also left Mr. Calnimptewa utterly destitute and homeless and unable to provide for himself and attend to his medical needs.

84. **Count 11:** Mr. Calnimptewa maintains that the company intended to cause emotional distress to him when they failed to pay him for worker's compensation without a denial of his claim but still maintained a claim against Mr. Calnimptewa without a justifiable defense as to not to pay him his worker's compensation benefits which continued to force Mr. Calnimptewa to

suffer from his pain and continue to leave him destitute. The actions of which were outside the bounds of decency as there was no claim denial filed and no reason to drag out a claim against Mr. Calnimptewa, but for to force him through the process and his needs to take a settlement offer and was a means to mitigate the liability owed toward Mr. Calnimptewa which was the underlying purpose and intent of maintaining the action of withholding benefits from him.

85.     And or the actions were done with reckless disregard with a probability that their actions would cause emotional distress to Mr. Calnimptewa in light of the company's intent which was to mitigate liabilities owed to the company, as described in the fraud section and as to the discrimination it caused in the discrimination section and under the breach of fiduciary duty claims.

86.     Mr. Calnimptewa suffered emotional distress and emotional distress that was severe as a result of the intentional actions. The actions exacerbated Mr. Calnimptewa and his condition related to depression. It affected his marital relationship with his wife and with his in-laws. He spent countless days without the ability to attend to his medical needs and without the ability to afford the pain medication he needed. It took over 5 months for him to obtain the surgery he needed which could have happened within a month of the injury had the company properly addressed and attended to the situation.

87.     It left Mr. Calnimptewa in physical pain that he had to endure until his surgery which was unneeded and unnecessary physical pain as well as the pain he had to endure while driving to Stockton, California as well as to Arizona. He suffered from feelings of hopelessness, helplessness, anger, fear, frustration, lack of sleep, anxiety, increased depression, thoughts of suicide and injury to his person as noted in this complaint. The emotional trauma he suffered at

the time of his injury and continued due to the company's intentional actions or reckless actions up to and after his surgery and of which he still suffers.

## INTENTIONAL INTERFERENCE WITH ECONOMIC RELATIONS

88.   **That the company intentionally interfered with an existing and a potential economic relationship** that Mr. Calnimptewa had in relation to his private health benefits and worker's compensation benefits in that they made Mr. Calnimptewa drive to California on a torn knee without proper medical attention and federal authorization;

89.   **Count 1:** They intentionally did not allow Mr. Calnimptewa obtain the proper medical attention he needed for his knee when they told him to cancel his follow-up appointment with the doctor and did not schedule another follow-up appointment a month later and they made Mr. Calnimptewa drive to California on a torn knee without proper medical attention and federal authorization

90.   **Count 2:** They intentionally did not pay Mr. Calnimptewa through insurance in a timely manner at the time of his injury and did not pay for his pain medication despite not denying his worker's compensation claim as a means to mitigate liability owed toward Mr. Calnimptewa.

91.   **Count 3:** That they unlawfully talked to Mr. Calnimptewa's physician prior and interfered with Mr. Calnimptewa and his ability to discuss the matter with his doctor. That claimed that Mr. Calnimptewa could return to work on light duty despite the fact that he had not received an MRI or official diagnosis of his knee and did not determine if he could work specific job duties and was without a doctor's certification prior to attending to those duties and without discussing with Mr. Calnimptewa what those duties would be.

92.   **Count 4:** They intentionally terminated Mr. Calnimptewa's medical benefits prior to any

notification of termination.

93.     **Count 5:** They intentionally terminated Mr. Calnimptewa and his work benefits despite being put on notice of his inability to work and knowing that he had no knowledge of his job duties and his inability to commute to any location. This was also before Mr. Calnimptewa was actually terminated.

94.     **Count 6:** They intentionally left Mr. Calnimptewa destitute and still injured and undiagnosed when they terminated and did not pay him workers compensation benefits at that time that left him unable to work to attend to his medical injuries and his basic life needs and prolonged the time of which Mr. Calnimptewa could recover and return to work.

95.     **That Defendants did so by improper means** as they were required to pay him benefits and his medical bills as there was no dispute it was a work-site injury and was an attempt to avoid paying Mr. Calnimptewa benefits and claiming that he refused to work light duty when it was offered him.

96.     The actions of which interfered with his ability to return to work after his recovered with the company and his ability to obtain the same kind of work after his injury and prolonged his ability to obtain work due to the continuous knee problems that Mr. Calnimptewa still suffers. The actions of which also ultimately rendered Mr. Calnimptewa disabled long-term.

97.     Mr. Calnimptewa maintains that but for his ability to receive proper timely medical attention, he would have been able to obtain work in a timely matter and would not being suffering from the current injuries he suffers now as well as he would have received compensation from the company during the injury he also maintains that but for the intentional actions, that prolonged his surgery, he could have returned to work as a CDL driver and

remained in that profession up to retirement.

98.     The actions of which Mr. Calnimptewa lost wages and benefits past and future that he should have received but for the prolonged surgery and recover time as well as his ability to return to work as a CDL driver thereafter. *Eldridge v. Johndrow,* 2015 UT 21, ¶ 70, 345 P.3d 5

## DISCRIMINATION BASED ON DISABILITY UNDER THE AMERICAN WITH DISABILITIES ACT OF 1990

99.     Mr. Calnimptewa was employed by Swift  that had over 39,000 employees. Mr. Calnimptewa **suffered from a debilitating disability that made it so that he could not perform and substantially limited major life functions** which included walking in general, putting weight on his leg for a long period and time, and the severe pain he was suffering from in his knee as well as the back pain he was suffering from and working in his profession as a CDL driver which required federal medical certification after an impairment of a limb of which he never received and in that he ultimately qualified for disability, the action of which required pain medication, an MRI, surgery, rehabilitation, a knee brace and back brace. He also had a record of such impairment and was regarded as having such an impairment, when he was unable to work due to the injury he suffered from and required physical therapy initially.

100.    **Discrimination;***Mr. Calnimptewa incorporates the language from the other causes of actions and claims into this cause of action well, Gallagher Bassett is implemented as it relates to discrimination under the ERISA act and through activities of its agents with authorized or apparent authority as described in this complaint and the contractual relationship with SWIFT. The actions described were within the course and scope of the employment of Swift's employees as it related to their duties of assessing and reporting a work-site injury. Also, with the purpose of Swift's insurance claim's unit, the actions described herein was also for the purpose to benefit*

*swift, namely, to mitigate any liability toward Mr. Calnimptewa through through insurance claims adjustor.*

101.  **Count 1:** In that the company discriminated against Mr. Calnimptewa based on his disability and failed to accommodate him in allowing him to take time off work and see a physician when he was in Las Vegas. In threatening of terminating him if he did not drive to Stockton, California.

102.  **Count 2:** In telling him to cancel his doctor's appointment with the company and dictating his doctor appointments and what doctors he could see and keeping him from receiving the necessary medical attention and pain management he needed for his injuries and as a result, making denying Mr. Calnimptewa in making such facilities readily available to him.

103.  **Count 3:** In claiming that he had to ride a bus all the way him in light of his injuries and using his own money from his paycheck to pay for a bus ticket.

104.  **Count 4:** For not allowing Mr. Calnimptewa to have a follow-up appointment with the doctor until a month after his first visit as well as attending the physical therapy during that month and telling him to cancel those appointments.

105.  **Count 5:** For forcing Mr. Calnimptewa to go the emergency room on his private insurance due to the company's failure to give him the information he needed to bill for worker's compensation and made it so he could not afford the pain medication that was prescribed to him.

106.  **Count 6:** For unlawfully talking to Mr. Calnimptewa's through Ms. Mekimus acting on behalf of Swift Transportation as a claims adjuster for Mohave insurance or with apparent authority that she acted as an agent on behalf of the company to manage and review Mr. Calnimptewa's claims which made it so the doctor would not listen or assign pain medication to

him.

107. **Count 7:** For claiming that Mr. Calnimptewa was able to return to light duty without talking to Mr. Calnimptewa and explaining to him of his job duties, knowing that he had no means or ability to travel to the area of which the light duty was offered, knowing or should have known that he was in severe pain and was unable to perform any such duties, knowing that the duties were not under his job description, knowing that he had not been medically cleared by a federal doctor to work under his job description, for terminating his medical benefits before they even terminated Mr. Calnimptewa indicating the company's intent was to terminate Mr. Calnimptewa and find an excuse to terminate him and not pay him his benefits which was an unlawful and improper job restructuring based on the actual physical needs of Mr. Calnimptewa, this was also the unlawful limiting, segregating and classifying of Mr. Calnimptewa that adversely affected his employment status with the company.

108. **Count 8:** This was also a unlawful qualification standard and test and criteria used to screen-out Mr. Calnimptewa as explained in the fraud section and was not job-related to Mr. Calnimptewa's position as noted above and in this section and was not consistent with business necessity, in that Mr. Calnimptewa did not live in California, the company did not and was not expecting him to work in California and only did so when he was injured as a means to mitigate risk and find a way to terminate him when they found that he refused such a standard despite doctor's approval and as to Mr. Calnimptewa's status, abilities and job duties.

109. **Count 9:** The inquiry and determination of the company as it related to light duty and examination of Mr. Calnimptewa's claims, claiming to be an insurance company was also a prohibited examination and inquiry as to Mr. Calnimptewa and his injuries and the nature or

severity of the disability as the examination was not job-related and not consistent with business necessity, but was instead a risk assessment as to his injuries and a means to unlawfully mitigate liability owed toward Mr. Calnimptewa. The inquiry was also not made to determine his ability to perform job-related functions but was instead a scheme and method to mitigate liability and risk owed to Mr. Calnimptewa and was not in the best interest of his health as explained further in the fraud section and the conflict of interest it created. The standard they created, in approving his ability to work light duty, was also a direct threat to the health and safety of Mr. Calnimptewa and his undiagnosed injury as well as the standards to get him medical treatment hundreds of miles of where he lived and where he was at the time and determining that he should ride on a bus to get home and that he was physically fit to do so without medical evidence.

110. **Count 10:** For failing to communicate directly with Mr. Calnimptewa and his ability to return to work and determining what accommodations he needed to see if he could work what light duty they were offering, if had proper transportation and funds to do the light duty, if they were under his job description, if he needed crutches or a brace, how long he could sit and if he was on and had to be on any pain medication.

111. This was also knowing that prior the doctor at the initial visit at U.S. Health Works had issued the same original assessment at his initial injury then he did the months prior and they did not attempt to have him attend light duty at that time. This was also with knowledge that he did not obtain the necessary physical therapy and pain medication during that month and he had not improved since his initial visit. This is also in light of the fact that he had never he had the opportunity to be properly diagnosed for his knee at that time, obtain an MRI, and ultimately obtained the necessary surgery after the results of the MRI.

112.    **Count 11:** For failing to take Mr. Calnimptewa to a doctor when he was first injured in Las Vegas to a doctor after he had impaired his leg as a CDL driver which is medically and legally required for Mr. Calnimptewa and the company to do before he could drive again and instead forcing him to drive to California with the threat of losing his job as well as claiming that he would be stranded there.

113.    **Count 12:** For wanting Mr. Calnimptewa to obtain an MRI for his knee in Boise, Idaho which was nowhere were he was or lived and Pocatello, Idaho where he lived but was unable to return there do to his situation as a means to save money.

114.    **Count 13:** For prolonging his pain assessment, diagnoses and ultimate surgery as a result of their actions and making Mr. Calnimptewa have to find a way to attend to his medical needs without health insurance and without an ability to work.

115.    **Count 14:** For failing to pay and timely pay Mr. Calnimptewa for medical costs and benefits and provide insurance information under workers compensation which made it so he could not pay for his basic needs and recurring expenses despite the company's knowledge that it was a worksite accident which was a denial of facilities to accommodate Mr. Calnimptewa, this is also in light of the fact that the company claimed to be their own insurance company and that there was no denial of his initial claim, this also indicates that such accommodations was not a financial burden on the company given its size and resources.

116.    **Count 15:** The participation in with Mohave and Gallagher Bassett, was also a contractual relationship and arrangement that had the effect of subjecting Mr. Calnimptewa to discrimination on his disability and was a means to perpetuate discrimination who are subject to common administrative control as explained in the fraud section. The was also the unlawful

exclusion of Mr. Calnimptewa of his right to his benefits who was qualified for such benefits in suffering a work-site injury, the claim of which was never actually denied. This was also a qualification standard and test as it relates to their risk mitigation as explained in the fraud section and as a result, did not accommodate to him as it related to his known physical injury.

117.    The actions of which made Mr. Calnimptewa suffer from additional unneeded physical pain and which made the injuries that he suffered more severe to the prolonged time and use on the injured knee and back and also left Mr. Calnimptewa destitute, homeless, without medical benefits and unable to work and pain the necessary bills to attend to his needs. The actions of which were also reasonable in light of circumstances as noted above and would not place an undue burden on the company especially in light of the fact that they had their own company insurance to compensate for such claims.

118.    The company unlawfully used tests and methods and it related to mitigation of liability risk as explained in the fraud section as it related to Mr. Calnimptewa suffering from this disability. This is included schemes such as claims that he could work light duty, such as speaking directly to his doctors, such as forcing him to go to the doctors of his choice and dictating what kind of medical care he could have including cancelling his physical therapy. Withholding his workers compensation benefits from him and not paying him untils months after they were due for no just-case. For trying to "shop around" the country to find the cheapest doctors to attend to Mr. Calnimptewa's needs even if they were hundreds of miles away.

119.    **Wrongful Termination Count 16:** For wrongfully terminating Mr. Calnimptewa based on the injury he suffered  that caused him to be disabled that affected a major life function, namely, walking and his ability to work as a CDL driver. The termination of which came from

false claims of his ability to work light duty and refusal to do so without doctor authorization and communication with Mr. Calnimptewa and duties of which were not under his job description. The company also intended to terminate Mr. Calnimptewa prior to the actual termination and terminated his medical benefits prior.

120.    **Retaliation Count 17:** Retaliation against Mr. Calnimptewa for reporting a work-site injury and a disability at that time and forcing him to drive to Stockton California and for staying in Stockton, California due to his injuries with the threat of termination of he did not do so.

121.    **Count 18:** For forcing Mr. Calnimptewa using his own private insurance to attend to his medical needs and attending the emergency room due to his pain of which the company terminated his medical benefits as a result.

122.    **Count 19:** For attempting to obtain workers compensation benefits, for filing an EEOC complaint against the company and a workers compensation claim to obtain benefits and for obtaining the help of an attorney of which the company as a result, failed to pay for his medical benefits despite their failure to deny his claim, the company forced Mr. Calnimptewa to attend doctors hundreds of miles away and somehow find a way to obtain his own medical attention, the company told Mr. Calnimptewa to cancel doctors appointments, they took money out of Mr. Calnimptewa's own account to pay for his bus ticket.

123.    **Count 20:** The company claimed that he could return to light duty without a doctor's note, without indicating what Mr. Calnimptewa's job duties were, without receiving federal certification to work as a CDL under his job description, in an area where Mr. Calnimptewa did not reside and did not have transportation or funds for transportation in light of Mr. Calnimptewa explaining his inability to work with is injuries and attempting to learn what his job duties were,

without determining what kind of accomodations Mr. Calnimptewa needed if he could return to work, his inability to attend physical therapy and obtain pain medication and in light of the pain medication that he was prescribed and his inability to work while on that medication, in light of the fact that he still had not obtained an MRI at that time of which it was ultimately determined that he needed surgery and still is suffering from knee complications from the injury.

124. **Count 21:** Mr. Calnimptewa maintains that the actions and procedures of the company with light duty was a means and scheme to claim that they did not have to pay Mr. Calnimptewa worker compensation benefits with his light duty release which was done intentionally and in bad faith and not in the interest of Mr. Calnimptewa and his injury.

125. **Count 22:** For leaving him stranded and telling him that he would be stranded in California without proper benefits and medical attention and proper medical certification which was not the place of his residence and wanting to force him to drive on a bus to Pocatello with his injuries and take an MRI in Boise, Idaho with his injuries.

126. **Count 23:** For telling him to cancel medical appointments including physical therapy and personally speaking with his doctor and not allowing him to see the doctor on follow-up until a month after forcing him to go to the emergency room on his own and cancelling his health benefits so he could no longer attend to his medical needs on his own and forcing him to attend the doctors they wanted.

127. **Count 24:** For not paying for his medical costs for his MRI of which they setup for him and billed him instead. For not paying timely for his surgery or setting up and scheduling the ability for him to attend surgery.

128. **Harassment:** Mr. Calnimptewa maintains that he was subjected to unwelcome and

unwanted behavior based on his disability and the harassment was sufficiently severe to alter the terms and conditions of his employment as it related to his right for worker's compensation benefits, his right to health benefits, his right to choose the doctor of his own choice in light of his injury and his right to be free from workplace harassment.

129.    The actions individually and collectively created an atmosphere that was so severe that it altered the terms and conditions of his employment as it related a harassive and hostile work environment and caused emotional distress to Mr. Calnimptewa as described in the intentional infliction of emotional distress cause of action.

130.    **Count 25:** He was harrased when he was told that he would be terminated if he did not do his load in California and he would be stranded there if he could not return home.

131.    **Count 26:** That he was told to cancel his doctor appointments and that he had to return home on a bus with all of his belongings and in light of his injuries based on his disability which was unwelcome behavior based on his medical condition at the time.

132.    **Count 27:** He was harassed with the company personally called his medical doctor and interfered with a protected attorney patient privilege, the call of which was to speak about and mitigate the claims that Mr. Calnimptewa had toward the company to mitigate the liability toward the company..

133.    **Count 28:** He was harassed when the company did not pay his benefits or medical expenses. He was harassed when he was told they would schedule an MRI in Boise, Idaho.

134.    **Count 29:** He was harassed with the company claimed he could work light duty and continued to send letters claiming that he was not communicating with the company which were false which led to his ultimate termination based on the "No call no Show" policy.

135.  **Count 30:** He was harrased when they terminated his medical benefits prior to his termination and without prior notice or 30-day notice as required by Utah law or notice of COBRA benefits thereafter which was unwelcome behavior and it related to his ability to obtain benefits and was based on his disability.

136.  **Count 31:** He was harassed when he was told he could not talk to the insurance company directly and could not bill workers compensation for his injuries which was unwelcome behavior as it related to his ability to obtain his benefits and was based on his disability.

137.  **Count 32:** He was harassed when there was no denial of his workers compensation claim but he still did not obtain his benefits from the company. The company unlawfully claimed he was not entitled to benefits because he they claimed he refused light duty, the claims of which were unfounded and unwelcome behavior as to Mr. Calnimptewa's situation, they were false and improper as Mr. Calnimptewa was not able to work light duty and it was not under his job description as a CDL driver. The actions of which were based on his disability.

138.  **Failure to accommodate Count 35.** The company failed to properly accommodate Mr. Calnimptewa when he suffered from a debilitating injury. The injury was severe that it impaired his ability to walk and put him in severe pain. The company was lawfully required to and as a result, should have reasonably allowed Mr. Calnimptewa to seek medical attention in Las Vegas prior to driving the truck as a CDL to Stockton, California.

139.  They failed to reasonably accommodate Mr. Calnimptewa to allow him to attend his follow-up appointment with the doctor and attend physical therapy in light of the orders from the doctor. Telling Mr. Calnimptewa to cancel his doctor appointments was not reasonable and was only done so to mitigate any liability toward Mr. Calnimptewa in workers compensation

benefits.

140.    They failed to accommodate Mr. Calnimptewa when they wanted him to take a bus back home in light of all the injuries he had suffered from, his back, his elbow and his knee and all of the belongings. The actions were not reasonable in light of the circumstances and were again to limited liability owed toward Mr. Calnimptewa.

141.    The company failed to reasonably accommodate Mr. Calnimptewa when they cancelled his private insurance benefits that he was entitled to as an employee and up to 30 days after termination.

142.    The company failed reasonably to accommodate Mr. Calnimptewa when they failed to give Mr. Calnimptewa his workers compensation insurance information so that he could properly bill workers compensation for his medical injuries, knowing that Mr. Calnimptewa was injured on the work-site.

143.    The company failed to reasonably accommodate Mr. Calnimptewa when the company forced Mr. Calnimptewa to attend a light duty job, without knowing his physical limitations and without obtaining medical authorization for him to work light duty. This is also knowing what light duties Mr. Calnimptewa could do as a CDL driver under his job description. As a CDL driver, Mr. Calnimptewa was in charge of driving trucks and he could not drive a truck until he obtained federal medical authorization to drive of which he never obtained.

144.    The company failed to reasonably accommodate Mr. Calnimptewa when they attempted to set-up an MRI for his knee in Boise, Idaho hundreds of miles away from his home. They failed to reasonably accommodate Mr. Calnimptewa when they billed him for the MRI and forced him to seek his own medical aid with his worksite injuries in Arizona, even though he

should-have been paid through the worker's compensation system.

145. The company failed to reasonably accommodate Mr. Calnimptewa when they cancelled his medical benefits a month prior to terminating him. The action of which was done to force Mr. Calnimptewa from seeking his own medical attention and to force him to go to the doctors of their own choice. Mr. Calnimptewa was not able to obtain the proper pain management he needed as a result, nor was he able to schedule his own MRI. The MRI that the company scheduled for him occurred almost four months after his injury.

146. **Age discrimination Count 34:** Mr. Calnimptewa was also discriminated against based on his age. The company attempted to fraudulently mitigate liability toward Mr. Calnimptewa. If Mr. Calnimptewa was a younger driver, the scrutiny and unlawful oversight to his injury would not had occurred. Given that Mr. Calnimptewa was a potential serious liability to the company with his age and the unknown factor of his ability to fully recover from this injury given his age, the company attempted to find excuses and or a means to limit their liability toward Mr. Calnimptewa and drag out an unjustified claim against him for denying him worker's compensation payments.

147. This occurred through Swift's own purported insurance company which was only created designed and implemented to limit liability claims against Swift. Because of this, they forced Mr. Calnimptewa to go to a different doctor in another state and hundreds of miles away from his home. They did not give Mr. Calnimptewa his worker compensation benefits or information when he first reported it even though they knew it was a work-site injury because of his age. They attempted to mitigate and fabricate a claim to lessen liability toward Mr. Calnimptewa with the claim that he was released to do light duty without doctors authorization as to the duties,

without Mr. Calnimptewa and his improvement from his injury prior, without noting how that would accommodate Mr. Calnimptewa with his knee injury.

148.     The actions of which caused Mr. Calnimptewa, severe emotional distress, lost wages and benefits, including payment of worker's compensation benefits in a timely manner, loss of enjoyment of life, consequential damages for the failure to pay him and the unlawful termination, attorney fees and costs and actual additional and unnecessary pain that he suffered as a result of the discrimination. He also seeks reasonable attorney fees under these claims as authorized by statute.

**FRAUD**

149.     Plaintiff claims that defendants defrauded him by making a false, statement of fact that caused him harm.

150.     **Count 1:** Swift through Ms. Malkemus, who was acting in the course and scope of her employment under her job description with the intent to benefit the company as a claims adjustor with the sole purpose and intent to mitigate liability claims toward Swift acting as an agent on behalf of Swift. Ms. Malkemus purpose was specifically in this case, to mitigate liability of Mr. Calnimptewa worker's compensation claim even though she knew it was a work-site injury and that Mr. Calnimptewa was entitled to relief from his injuries including medical and employment wages.

151.     Swift through Ms. Malkemus intentionally made a false statement about his health condition to claim that he was able to return to work and to work light duty and that Mr. Calnimptewa had refused light duty. This was false, as he was not able to return to light duty given his health condition with a torn ligament in his knee as well as pain from a fracture in his

elbow and was experiencing lower back pain.

152.     The company through Ms. Malkemus had not communicated with him the duties to determine if he could be properly accommodated. Mr. Calnimptewa tried to speak to the company to ask what his job duties were of which they refused. He tried to speak to the company through counsel to explain to them of his inability to work and were on notice that he was not medically able to work at that time.

153.     The intent of which was made for the purpose to mitigate liability toward Swift and Mr. Calnimptewa and to find an reason to claim and explain why they discontinued workers compensation benefits toward him and mitigate liability owed toward him, private medical benefits and terminated him as a CDL employee with the company. The intent to was to defraud Mr. Calnimptewa to claim that he no longer had a workers' compensation claim and right for additional compensation for his recovery.

154.     The light duties of which were not and could not be under his job description as a CDL driver and he had not obtain certification to return to work as a CDL driver. The job of which was also hundreds of miles away from where Mr. Calnimptewa lived and he did not have transportation or the means to work any light duty.

155.     The actions of which the company also knew of which were false as they never communicated to Mr. Calnimptewa what his job duties were. Ms. Malkemus also knew that Mr. Calnimptewa did not have specific medical authorization nor could he have specific medical authorization without knowing what his light duties were that he could communicate with and have a doctor approve. Or the statements were made the statement recklessly and with disregard for the truth as the company did not know of the current medical condition of Mr. Calnimptewa

that they could communicate to the doctor as to his pain.

156.    Ms. Malkemus knew that the light duty return to work release was not legitimate and that it had an ulterior motive and intent as means to limit Mr. Calnimptewa's ability to obtain workers compensation and an excuse to terminate him if he could not medically return to work. It was not in the best interest of Mr. Calnimptewa and his condition and the company was acting on that policy instead of the best interest of their employee as a means to save money and future liabilities,

157.    Ms. Malkemus also knew the communication was false and was to mitigate liability. The company terminated Mr. Calnimptewa's medical benefits prior to terminating him. The action of which was to force Mr. Calnimptewa to attend the doctors do their choice and allow Mr. Malkemus to talk to the doctors specifically of Mr. Calnimptewa's condition, unlawfully and in violation of HIPPA. This was also to mitigate liability toward Mr. Calnimptewa. As a result, the reason

158.    The company also knew that Mr. Calnimptewa had not worked for over 40 days prior to this because of his injury. They knew that he had not medically improved since then. They knew this and Ms. Malkemus specifically knew this because she told Mr. Calnimptewa to cancel his doctor appointments and his physical therapy appointments.

159.    She knew that Mr. Calnimptewa had gone to the hospital twice to seek medical attention because the company had not given him the workers compensation information to bill workers compensation. Ms. Malkemus knew the pain that Mr. Calnimptewa was suffering from and he need for pain medication. Ms. Malkemus knew that Mr. Calnimptewa could not work light duty if he was on serious pain medication.

160.    The pain of which was servere and of which Mr. Calnimptewa suffered from every day. She knew that he had a doctors note that indicated that he could not return to work until he saw a specialist which did not occur until he obtained his MRI after he was terminated,

161.    The actions of which were done to limit liability owed toward Mr. Calnimptewa as a scheme and method to claim that he was offered light duty of which he refused and as a result, was not allowed to obtain workers compensation benefits.

162.    The actions of which Mr. Calnimptewa had to rely on for the basis as to the denial of the benefits and the termination from his occupation and induce Mr. Calnimptewa to rely on why the company denied him workers compensation benefits and as an excuse to claim the company did not owe Mr. Calnimptewa any future workers compensation benefits because he had denied light duty. The purpose of which was to make a case against Mr. Calnimptewa, in his disabled and destitute condition, to claim that they owed to benefits to Mr. Calnimptewa as an employee that had suffered an work-site injury.

163.    The claim of which was the only basis Mr. Calnimptewa had to rely on and as a result could only reasonably rely on as to why the company failed to give him his workers compensation benefits. This was because the company had not denied his claim and paid him benefits prior.

164.    The actions of which caused Mr. Calnimptewa to lose private benefits and his position which includes lost wages and benefits, workers compensation benefits, his ability to obtain medical treatment for his medical injuries and in a timely fashion as well as associated emotional distress and suffering and left him ultimately destitute and delayed his ability to properly recover from his medical condition and caused additional damage to his injury and pain and suffering.

165.    The actions of which were intentional and were in disregard for Mr. Calnimptewa health and well-being related to his injury and his emotional well-being. They were also willful, intentional and reckless disregard for his health as the purpose was a scheme and method to attempt to mitigate damages toward Mr. Calnimptewa and to create a method and scheme to claim they did not owe Mr. Calnimptewa any workers compensation benefits. The entire purpose intent or Ms. Malkemus and her actions toward Mr. Calnimptewa was a scheme, method and ploy to limit liability owed toward Mr. Calnimptewa under the direction of the company.

166.    As a result, this was not a one-time isolated occurrence of an employee that had gone "rogue." Instead the specific job description and duties of Ms. Malkemus and her purpose was to intentionally find a method means to mitigate liability toward Mr. Calnimptewa. It was made through a scheme of other employees and "think tanks" hired by the company to find methods, schemes and actions to find an excuse not to pay and reasonable and legitimate claims that they company itself knew was valid. As a result, the actions alleged here is chronic and severe and the company should now be punished through punitive damages to punish the actions that occurred here and to deter future actions.

167.    They knew that the company was not intending on actually compensating Mr. Calnimptewa for injuries and losses billed as if they were an actual insurance company, and instead acted as an entity, and claimed to have their own insurance company, as a means to defraud Mr. Calnimptewa, meaning, that the company had no actual intended to pay Mr. Calnimptewa's medical expenses as they incurred. Instead, the purpose of the company was to mitigate risk of the company and expenses related to employee work-accidents. The company created a scheme where they dictated where Mr. Calnimptewa had to go to obtain medical

assistance, with threats of termination if Mr. Calnimptewa did not comply. The threats of which were coercive and harassive as a means to mitigate damages owed to Mr. Calnimptewa.

168. **Count 2:** Swift, held out out to have their own insurance company to cover for claims related to their employees and their accidents which was false in that the company was not an actual bonafide insurance company with separate assets from Swift and its intent and purpose was not to find compensate injured individuals, but to instead find ways to mitigate liability owed to their insured or third-parties.

169. The company noted with the SEC, "We ensure certain casualty risks through our wholly-owned captive insurance subsidiaries, Mohave and Red Rock. Mohave and Red Rock provide reinsurance associated with a share of our automobile liability risk. In addition to insuring a proportionate share of our corporate casualty risk, Mohave provides reinsurance coverage to third-party insurance companies associated with our affiliated companies' owner-operators."

170. The company claimed that Mohave was an active insurance company for them with their filings with the Securities and Exchange Commission or "SEC." The noted to the SEC that their "operators were covered by liability coverage and self-insurance retention limits. However, each is responsible for physical damage to his or her own equipment, occupational accident coverage, and liability exposure while the truck is used for non-company purposes. Additionally, fleet operators are responsible for any applicable workers' compensation requirements for their employees."

171. They also noted "We self-insure a significant portion of our claims exposure and related expenses for cargo loss, bodily injury, workers' compensation, and property damage, and

maintain insurance with insurance companies above our limits of self-insurance. Self-insurance retention and other limitations are detailed in Part I, Item 1, under "Safety and Insurance." Our large self-insured retention limits can make our insurance and claims expense higher or more volatile. Additionally, if our third-party insurance carriers or underwriters leave the trucking sector, it could materially increase our insurance costs or collateral requirements, or create difficulties in finding insurance in excess of our self-insured retention limits.'"

172.     "We accrue for the costs of the uninsured portion of pending claims, based on the nature and severity of individual claims and historical claims development trends. Estimating the number and severity of claims, as well as related judgment or settlement amounts is inherently difficult. This, along with legal expenses, incurred but not reported claims, and other uncertainties can cause unfavorable differences between actual self-insurance costs and our reserve estimates. We try to limit our exposure to claims that ultimately prove to be more severe than originally assessed. However, this may not be possible if carrier subcontractors under our brokerage operations are inadequately insured for any accident."

173.     "Although we believe our aggregate insurance limits are sufficient to cover reasonably expected claims, it is possible that one or more claims could exceed those limits. In this case, we would bear the excess expense, in addition to the amount of self-insurance. Our insurance and claims expense could increase, or we could find it necessary to raise our self-insured retention or decrease our aggregate coverage limits when our policies are renewed or replaced."

174.     In their SEC filings, they noted that "Restricted cash and cash equivalents, and restricted short-term investments are primarily held by our captive insurance companies for claims payments." They claimed that there was a restricted cash amount of for each of the losses.

175.    In 2010 with the SEC they noted, restricted cash balances grew by $59.7 million more in 2010 versus 2009, which further contributed to the cash used in investing activities. The increase in restricted cash during 2010 primarily reflects increased collateral requirements pertaining to our wholly-owned captive insurance subsidiaries, Mohave and Red Rock, which together, beginning on February 1, 2010, insure the first $1 million (per occurrence) of our motor vehicle liability risk. To comply with certain state insurance regulatory requirements, we paid $55.2 million during 2010 to Red Rock and Mohave as collateral in the form of restricted cash for anticipated losses incurred in 2010. This restricted cash will be used to make payments on these losses as they are settled in future periods and such payments will reduce our claims accruals balances.

176.    Under their Federal Motor Carrier Safety Administration or "FMCSA", motor Carrier form under USDOT number 54283, there is no mention of Mohave Insurance. The company only mentions Red Rock Risk Retention Group under surety number RRG136818-10 with coverage up to $1,000,000.00 as of 2018. Their primary insurance claims to be self-insured only to go to 2010. All other insurance relates to Cargo and Surety.

177.    With that, the company held out to be a separate insurance company with claims of the necessary the financial backing and regulations required to be an insurance company. The company of which actually did not have the financial backing to hold out to be an insurance company for its employees as required as they noted that the restricted cash was for insurance payments, however, the restricted cash was also used for investment as they claim and they claim that the investment grew. This indicates that the amount set aside was not actually for the insurance company. They also noted that Swift would pay the company's a specific amount for

liability a year., which indicates that the insurance was not financially independent from Swift. It also indicates that the company was only allowed to work under budget as to what was allotted to them to pay out damages which is not how an insurance company works nor is Swift authorized to act as a reinsurance company for Mohave but its actions indicate they held out to.

178.    The SEC filings note that the company instead, billed Swift for its insurances and made requests for Swift to pay for its claims as they became alloted, indicating they did not actually have the capital or proper securities to ensure that each Swift CDL driver of over 39,000 drivers were properly licensed and that their licenses in the state they were issued complied with the minimum limits as it related to each policy. The FMSCA requires minimum limits of $5,000 and $10,000 per occurrence for liability. States require on average minimum limits of $25,000 per occurrence. This would require the company to hold limits of over $975 million for just liability insurance alone. Mohave did not have that backing and could not if they were paid a specific amount each year. Also, they indicated that Mohave billed Swift for its administration, fees and liabilities, indicating that Mohave did not have the actual cash on its own, but was only authorized through Swift Transportation, INC.

179.    Through the SEC filings, Swift notes how concerned they are about insurance losses and liability. In order to mitigate that risk, they claimed to have created their own insurance company and as a result, all other insurance policies they held were only securities to their claimed insurance company with Mohave. However, they did not claim with the FMSCA as they did with the SEC that Mohave is an actual insurance company. They also claimed that money is reserved for the insurance companies' in restricted cash but claim to the contrary that the restricted cash is used as investments and that those investments actually grew instead of taking a loss to pay out

liability claims.

180. They also noted that SWIFT would allot a specific amount for insurance for liability each year. This also indicates that the company allotted a specific amount of cash through the budget of what they would be willing to pay in liability. Which is contrary to an insurance company, where they allot specific amount of cash as it relates to each asset covered as required by federal and specific state law. Also, they indicated that Mohave billed Swift for its administration, fees and liabilities, indicating that Mohave did not have the actual cash on its own, but was only authorized through Swift Transportation, INC.

181. In sum, Mohave Insurance company and how it was operated and financially backed was not pursuant to an actual bonafide insurance company of which they held out to be and intended to hold out to. They held out to be one with the SEC to explain their cash-flow and reason for the insurance company, but how the money was actually held and distributed was through SWIFT, the sole owner of the insurance company, and the money was not actually restricted cash, but was actually invested elsewhere and actually took a gain instead of liability for the company. The actions of which Mr. Calnimptewa relied on that they were able to adjust and dictate and determine liability, the actions of which they lawfully had no ability to do so. The actions of which also created a conflict of interest with Mr. Calnimptewa when they attempted to mitigate their damages toward Mr. Calnimptewa knowing that he had suffered a work-place injury.

182. The actions of which damages Mr. Calnimptewa as he was not able to get an actual fair assessment of his work-place injury through a bonafide insurance company and was subject to fight with his own company to receive compensation for his injuries. This caused the company to take an advance out of Mr. Calnimptewa's paycheck to pay for his bus ticket. This caused the

company to cancel his medical benefits. This caused the company to find ways to claim they did not owe Mr. Calnimptewa instead of genuinely assess his claims. This caused Mr. Calnimptewa and deny Mr. Calnimptewa of his right to have his claim properly assessed and determined by a bona-fide claims adjuster that did not have a severe conflict of interest toward him with ulterior motive and not acting in his best interest. This as result, caused Mr. Calnimptewa to not receive the benefits of an actual insurance company at the time he suffered from his work-site injury and caused additional pain, injury, emotional distress and pain and suffering as a result.

183.    **Count 3:** Also, as noted in the specific facts as it relates to Mr. Calnimptewa and to the underlying purpose of their claim and objective to hold-out to be an insurance company, namely, to reduce liability payment and costs, how the company was owned and operated as to administration of liability claims was not pursuant to an actual bona-fide insurance company. Despite this, they held out to be an insurance company and Ms. Melkemus held out to be a "insurance claims adjustor" and held out ot claim that liability claims would be paid based on proof of injury.

184.    The actual purpose and mission of the company, was instead to find a way to reduce liability and payments owed toward third parties and those with claims against swift, including their own employees. This involved strategy and plans to find way to reduce risk. The actions was to defraud Mr. Calnimptewa and the liability owed toward him.

185.    This included finding the cheapest doctors in the U.S. for medical treatment and shopping around for the cheapest doctors which occurred here with Mr. Calnimptewa. This included unlawfully speaking to healthcare providers of the claimants. This included directing where a claimant could go to obtain medical assistance as it related to its own employees. This included

using legal nuances to reduce risk, namely as how the strategy was used in this case under Utah law, creating and implementing a strategy and plan where high-risk workers as to their injuries were mitigated through claiming that they were approved and offered to work light duty. This is despite the individual's actual injuries, the individual's actual position and duties without talking to the employee and knowing his capabilities and ability to work without pain management. This was before Mr. Calnimptewa had his surgery on his knee. This was also where they tried to have Mr. Calnimptewa work where he did not live and did not have means or transportation to work there on top of his medical injuries.

186. This also made it to where the company was able to dictate what doctors individuals could go to, that they could talk to the doctors and they could tell their employees to cancel appointments, buy a bus ticket from the employee's own paycheck, and withhold workers' compensation insurance benefits from their employees as a means to get them to settle lower amounts than they should and dictate where they can go and what they can do to obtain medical treatment. It allowed them to withhold liabilities owed without just cause.

187. It allowed them to create a claim that a certain employee was not owed anything because they were offered light duty and they rejected it, overlooking, undermining and concealing the actual serious medical condition one may be suffering from.

188. This also indicates that the actions described herein were intentional, namely, the mitigate liability insurance and payments owed to claimants and or were in reckless disregard, knowing that the effect of their insurance company would substantially create the risk due to the financial interest of the company to save money as they described with the SEC.

189. This also indicates that the actual intent was to defraud individuals and liability owed to

them in light of their claims instead of review the claims in good-faith based on the injury.

190.     With that, the claim that Mohave was an insurance company was false of which Mr. Calnimptewa had to materially rely on, or that the company concealed to Mr. Calnimptewa that they had their own insurance company of which he relied on.

191.     The claim and or concealment of which was used not to actually cover legitimate claims, but to find ways and methods to mitigate the liability owed to Mr. Calnimptewa, to reduce the amount of premiums and deductibles owed to actual bonafide insurance companies through unethical and unlawful techniques and methods, through a specific budget and quota with goals and limits to reduce risk and created serious conflicts of interests the company owed to its employees and their claims and and a means to terminate employees to attempt to mitigate high-risk employees and their injuries through this scheme and method to further reduce liability and future liability owed to them.

192.     This is also in light of the fact that Mr. Calnimptewa was later found to be disabled by the Social Security Administration after his surgery, despite the company's claims that he could work light duty immediately after his injury. This is also in light of the company cancelling Mr. Calnimptewas' private insurance, as means to force him to only go through their approved doctors which occurred before they even terminated Mr. Calnimptewa.

193.     This is also in light of knowing that Mr. Calnimptewa was told to go to physical therapy, never went to physical therapy, did not improve since his accident, but claimed he could now work light duty, despite him already spending over a month off of work due to his injury.  This is also in light of the fact that Ms. Malkemus claimed that Mr. Calnimptewa "did it wrong" when he initially went to a private doctor for aid as to his injury and forced him to go to one of their

doctors.

194.     This also forced Mr. Calnimptewa to contact and hire an attorney to get the company to pay his benefits as he was concerned about how they were handling the situation and how he was being treated. This also forced Mr. Calnimptewa to have to negotiate every single payment that the company paid to him, instead of the company paying for all claims and a finding of a workplace injury, which is also not the appearance or likeness of an insurance company.

195.     The company wanted a specific determined amount to Mr. Calnimptewa' claim. As a result, this forced unnecessary delays in his payments, unnecessary litigation, the defenses of which were not in good faith as there was already a finding of a work-place injury and Mr. Calnimptewa could not work light duty, with the intent for the company to come to a specific determined amount of Mr. Calnimptewa and his high-risk and the dragging out the case in bad-faith coercively forced Mr. Calnimptewa to accept an offer given his destitute condition.

196.     The company specifically intended that the statements would be materially relied on; as to the reliance of the information communicated to Mr. Calnimptewa's doctor regarding his current health condition, as to the company's reliance of information as to Mr. Calnimptewa's health condition and his ability to return to work under light duty and as to the reliance on the information of Mr. Calnimptewa of which he had no choice but to rely on the company's claim that the reason for his termination was that he refused to work the light duty that was offered him and the statements of which Plaintiff had to reasonably rely on as the basis for his termination and justification as to why the company was not paying him his workers compensation benefits.

197.     The only issue to determine was whether or not Mr. Calnimptewa suffered a work-site injury. The company never disputed that he suffered a work-site injury. As a result, Mr.

Calnimptewa should-have been compensated for lost wages and for medical benefits at the time of his injury. Mr. Calnimptewa should have been able to attend the doctor of his choice and have it be billed to Worker's Compensation. Mr. Calnimptewa should have been diagnosed and seen a specialist within a week of his injury. He should have had an MRI taken within three weeks of his injury. He should have had surgery within four or five weeks of his injury and been recovering. Instead, as a result of the fraudulent actions of the company attempting to mitigate damages toward Mr. Calnimptewa, they caused additional pain and injury to his injuries. They caused him to go without appropriate pain management. They caused him to delay his diagnosis and surgery by five months. They caused him to find his own means to have surgery. They caused him to find his own means for pain management. They caused him to find a way to provide for himself on his own with his injury. They delayed timely payments to him that would have allowed him to properly take care of himself.

198. **Plaintiff suffered damages as a result of relying** on the statements as he had no recourse from the company as to his termination and his benefits and lost wages as well as the continued undiagnosed condition of his knee additional damages and pain to his knee as to what was communicated to his doctor and without the doctor ordering a MRI for his knee and pain medication for his knee he caused continued prolonged unnecessary pain to Mr. Calnimptewa as well as pain and suffering and emotional trauma as explained herein and his wages and benefits and emotional distress he suffered as a result of his termination and his inability to provide for himself and his health condition..*Cardon v. Jean Brown Research,* 2014 UT App 35, 327 P.3d 22. Plaintiff also incorporates these claims as it relates to the company acting as an authorized agent with actual or apparent authority for claims under the  EMPLOYEE RETIREMENT

INCOME SECURITY ACT OF 1974 and also seeks punitive damages as explained in this complaint for the intentional actions. Mr. Calnimptewa also incorporates the specific pain and suffering he suffered from to show emotional distress.

## BREACH OF FIDUCIARY DUTY

199.    In order to determine whether or not a fiduciary duty exists, Utah looks to see if the relationship imparts a position peculiar confidence placed by one individual in another. *First Sec. Bank of Utah N.A. v. Banberry Dev. Corp., 786 P.2d 1326, 1333* (Utah 1990) (citation omitted). A fiduciary is a person with a duty to act primarily for the benefit of another and is in a position to have and exercise and does have and exercise influence over another. *Id.* In short, a fiduciary relationship implies a condition of superiority of one of the parties over the other. *Id.* Generally, in a fiduciary relationship, the property, interest or authority of the other is placed in the charge of the fiduciary. *Id.*

200.    Here, the Mr. Calnimptewa and Swift were in a position where Swift was in a position of peculiar confidence in assessing and addressing his work-site injury as it related to workers compensation and had superiority over Mr. Calnimptewa they also did not allow Mr. Calnimptewa talk directly to the workers compensation insurance carrier to work-out payment of health benefits and was a fiduciary duty as they held out to be their own insurance company with their own insurance company with the actions committed through Ms. Melkamus holding out to be an insurance claims adjuster, acting within the course and scope of her employment under her duties as an insurance claims adjuster, with the specific intent to limit liability owed toward Mr. Calnimptewa and to finds methods, schemes and excuses to to pay claims owed to Mr. Calnimptewa which they knew were valid and that Mr. Calnimptewa had suffered from a

work-site injury. The actions of which were to benefit the company and limit liability owed toward the company on their behalf.

201. **Count 1 :** SWIFT had the duty to determine whether or not Mr. Calnimptewa was medically cleared before driving on his knee again to Stockton, California through a federal medical certification which was breached when they forced him to drive on his hurt knee and threatened to terminate him if he did not. The duty of which was breached when he was forced to drive to California on his hurt knee and caused additional pain and injury and distress to Mr. Calnimptewa.

202. The company had a duty to provide proper medical attention and accommodation to Mr. Calnimptewa with his injury, and to report a worksite injury which was breached when the company told Mr. Calnimptewa to cancel his doctor and physical therapy appointments, when they forced him to get an MRI in first Boise and then Pocatello. When they unlawfully spoke to his doctor to downplay his injuries. When they failed to pay for the billing for his MRI they setup. When they failed to pay for the billing for his surgery and instead found an excuses and delayed time as to not to pay Mr. Calnimptewa his health benefits. When they cancelled his private medical benefits. The actions of which caused additional injury and pain to Mr. Calnimptewa and his original injuries, distress and consequential damages.

203. The company also had a duty to have Mr. Calnimptewa only be paid through the insurance company, the duty of which the company instead personally paid Mr. Calnimptewa part of the benefits they paid him and held out to be an insurance company through fraud as explained in the fraud section.

204. The company also had a duty through their own insurance company or claiming to be

their own insurance company with Ms. Malkemus as an "insurance claims adjustory" to only pay expenses incurred as a result of the injury, the duty of which was breached as they attempted to proactively find a way to mitigate any damages owed to Mr. Calnimptewa as explained in the fraud section. This was without a denial of Mr. Calnimptewa' claim. This was knowing that he had suffered a work-site injury.

205.    They had a duty to pay Mr. Calnimptewa his average weekly salary and medical costs to the doctor of his choice of which they breached when they failed to timely pay Mr. Calnimptewa for his weekly wage and for his medical costs and allow him to bill worker's compensation for his injury. The duty of which was breached when they did not properly pay his injuries, give him billing information that doctors could bill for his injury, cancelled his private insurance, forced him to go to doctors of their own choice. This also included taking money out of Mr. Calnimptewa' paycheck as an advance to pay for a bus ticket.

206.    **Count 6:** This included the duty of the company to allow Mr. Calnimptewa to talk to his doctor about his injuries in private and handle his own appointments. The duty of which were breached when the company reached out to Mr. Calnimptewa doctor to discuss his injuries in violation of HIPPA which ultimately resulted in Mr. Calnimptewa only receiving tylenol for his pain and required to go to the Emergency Room thereafter and delayed his ability to be properly diagnosed. When they told Mr. Calnimptewa to cancel his follow-up appointments. When they failed to allow Mr. Calnimptewa to attend physical therapy appointments that was order by the doctor.

207.    **Count 7:** This included the duty of the company to properly notify Mr. Calnimptewa of termination of his health benefits, and giving him notice of his right to continue health benefits

through COBRA and to keep Mr. Calnimptewa on his health insurance while employed with the company and to have a bonafide reason for terminating his benefits. The duty of which was breached when they terminated Mr. Calnimptewa health benefits prior to when Mr. Calnimptewa was actually terminated. It was breached when the reason for his termination was as a result of fraud as explained in the fact section and discrimination based on his disability.

208. **Count 8:** This also included the duty toward Mr. Calnimptewa to properly administer his claims in good-faith. The duty of which was breached when the company found an excuse in fabricating a claim that Mr. Calnimptewa was released to light duty as a means to mitigate risk from their insurance company. The duty of which was breached when they fraudulently held out to be a claims adjuster and insurance company as explained in the fraud section. The duty of which was breached when the actual purpose was to mitigate liability toward Mr. Calnimptewa instead of an actual assessment of his claims.

209. The duty of which was breached as the way the company was setup and its purpose as explained in the fraud section, created a severe conflict of interest and its duty to properly administer claims in good-faith. The duty of which was breached when they acknowledged he suffered a work-site injury but still failed to pay him claims. The duty of which was breached when they failed to pay his medical expenses. The duty of which was breached when they dictated his doctor appointments and told him what doctors he could attend.

210. The conflict of which breached the duty owed to Mr. Calnimptewa as one of their insured in dictating which doctors Mr. Calnimptewa would attend, and what kind of compensation he would obtain for his injuries and taking money out of Mr. Calnimptewa's own paycheck to pay for the injuries he sustained and force him to find his own means and method to pay for his cost

of living, provide for basic needs as well as his medical needs and dictating what kind of medical help he would obtain.

211.    But for this conflict, Mr. Calnimptewa would have been diagnosed months earlier with his injuries. But for this conflict, Mr. Calnimptewa, if he would have been forced to follow the instructions of the company, could have created greater injury to Mr. Calnimptewa if he had worked light duty and was never able to actually be diagnosed and did create greater injury in the delay of his diagnosis.

212.    The duties of which was breached when the company terminated Mr. Calminenwa's health benefits prior to when they actually terminated him.

213.    But for this conflict, Mr. Calnimptewa would have been diagnosed months earlier with his injuries. But for this conflict, Mr. Calnimptewa, if he would have been forced to follow the instructions of the company, could have created greater injury to Mr. Calnimptewa if he had worked light duty and was never able to actually be diagnosed and did create greater injury in the delay of his diagnosis. But for this conflict, his worker's compensation benefits would not have been withheld, delayed or had to of been litigated and was not forced to take a sum out of desperation as a result of the conflict of interest.

214.    The breach of which was the proximate cause of Mr. Calnimptewa injuries as explained in this complaint as it relates to the expenses he incurred, the stress, anxiety, depression, additional unnecessary pain and suffering, additional injury to his knee, consequential damages, and other injuries related and explained herein. It caused Mr. Calnimptewa to suffer from lost wages and benefits, including workers compensation and private medical benefits and retirement benefits.

215. The actions were also intentional and in wilful wanton disregard for Mr. Calnimptewa's life in light of his claims, injuries and needs, disability and pain. The actions of which were intentional as noted in the fraud and intentional infliction of emotional distress and these claims. The intent was to find methods and schemes to limit liability toward Mr. Calnimptewa instead of conduct and actual bonafide analysis and review of Mr. Calnimptewa's claims. The disregard of which requires the need

## VIOLATION OF THE EMPLOYEE RETIREMENT INCOME SECURITY ACT OF 1974

216. "Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary." *(Section 409 ø1109(a) of the ERISA ACT)*

217. "A Fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan; (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; *Id at SEC. 404. Ø1104. This action is also proper in civil federal court pursuant to 502. Ø1132*

218.     Here, Gallagher Bassett, through SWIFT, acting as an agent for Gallagher Bassett in assessing and administrating Mr. Calnimptewa medical benefits claims for workers compensation or with apparent authority with using the same counsel for both entities and for the actions done by Ms. Malkemus in reviewing the claim and in that Mr. Calnimptewa was told that he could not directly communicate to the insurance company and could only communicate through the company to address his workers compensation benefits.

219.     Here, Gallagher Bassett had the duty to provide benefits to Mr. Calnimptewa from a known work-site injury. The entities should have used the care and skill and prudence and diligence under the circumstances in paying Mr. Calnimptewa his benefits during his time off work and medical expenses, in abstaining from communicating with his doctor, in allowing him to choose the physician of his choose, in allowing him to access the insurance information to bill the insurance company with the physician of his choice, in abstaining from attempting to deny or limit benefits owed to him through claims that he could work light duty without a diagnosis on his knee.

220.     In assuring that he was properly compensated during his time off work and received the medical attention he needed for his time off work. Namely, once it was determined that Mr. Calnimptewa suffered a work-site injury, the determination of which was made early and was never disputed, Gallagher Bassett had a duty to pay any liabilities and future liabilities from the claim, this is also in light of the fact that there was no denial of claim actually issued for Mr. Calnimptewa to have to litigate, but was still forced to litigate the action despite no denial of his claim for withholding his owed benefits.

221.     **Count 1:** The duty of which was breached when Mr. Calnimptewa was not paid his

benefits despite the lack of claim denial and paying for some medical expenses and untimely paying part of his wages.

222.     **Count 2:** For dictating which doctors Mr. Calnimptewa could and could not attend, some of which were hundreds of miles away from where he lived and where he was, for telling him to cancel medical appointments and denying him physical therapy and delaying an MRI and forcing Mr. Calnimptewa to find a way to obtain surgery on his own accord.

223.     **Count 3:** For claiming that he could work light duty and claiming that he was not entitled to benefits for failing to attend light duty despite his injuries, the lack of a diagnosis, and his lack of improvement from when he had already been off work for over a month.

224.     **Count 4:** For failing to pay for the visits he did attend of which ultimately were sent to collections, including the MRI visit of which the company setup.

225.     **Count 4:** Gallagher Bassett also had a duty to pay or deny Mr. Calnimptewa his benefits in a timely manner of which they did not deny his workers compensation claim and there was never a question as to whether or not it was a worksite injury of which was breached when the company did not pay Mr. Calnimptewa for his time off work in a timely manner or for part of his time off work.

226.     **The actions of which delayed the medical treatment and diagnosis of Mr. Calnimptewa** including an MRI that was delayed for months and pain management after his knee surgery which caused additional unnecessary pain and suffering and additional damage to his knee, it caused him to become destitute and homeless as he could not pay for his bills and he could not work and provide for himself in light of his injuries. It caused him to travel hundreds of miles to obtain an MRI and then hundreds of miles to obtain surgery. It caused additional

damage to his knee and back. It caused unnecessary emotional distress and trauma.

227.  Mr. Calnimptewa still suffers from the same knee complications and there are concerns on whether or not he can ever return to work and whether or not his knee will ever be the same again and may need a knee replacement.

228.  Plaintiff also incorporates the claims of bad faith into this section and breach of fiduciary duty as it relates to Mohave acting as an authorized agent on behalf of Gallagher Bassett.

### BAD FAITH (UNDER BREACH OF FIDUCIARY DUTY AND THE ERISA ACT)

229.  **Count 6:** Against Gallagher Bassett for unreasonably denying payment of Mr. Calnimptewa worker compensation claim, knowing that he had suffered a worksite injury, setting up appointments on his behalf and failing to make timely payments to Mr. Calnimptewa so he could attend to his personal life needs and recurring expenses.

230.   The actions of which were unreasonable as the company had not denied his worker's compensation claim and he never received denial of his claim of which Mr. Calnimptewa still had to file an action with the Utah Labor Division because he was not receiving payments and did not have information to bill workers compensation for his injury.

231.  **Count 7:** And that the company in bad faith used an interpretation of policy to claim that Mr. Calnimptewa had refused light duty which was false as noted in the other causes of action with fraud, intentional infliction emotional distress, intentional interference with economic relations and discrimination based on disability and the factual section noted in this complaint and the company knew that Mr. Calnimptewa had called the company through counsel and on his own to explain his medical condition and inability to work.

232.  **Count 8:** For implementing deceptive and fraudulent actions explained in this complaint

in the fraud section for dictating Mr. Calnimptewa's doctor appointments, for terminating his health insurance benefits so he could not attend to the needs on his own and for refusing to settle his claim and force Mr. Calnimptewa to engage in a frivlious action and defense despite the company already claiming that he suffered from a worksite injury.

233.   **Count 9:** For claiming that he could work light duty without a doctor's note that specified the duties of which was discussed with Mr. Calnimptewa and his doctor and thereafter with the company, the duties of which were outside the scope of Mr. Calnimptewa job description and of which he was not medically cleared to perform his job duties as a CDL driver.

234.   **Count 10:** For unreasonably denying settlement offers of Mr. Calnimptewa to receive the compensation for his injuries.

235.   **Count 11:** For maintaining an unreasonable argument and claim that he had denied light duty despite the fact that he was unable to work light duty given his medical condition, he had contacted the company of his condition, he had not obtained an MRI, he did not know what light jobs were offered him and whether or not he could work it and whether or not he could be transported to the job in light of his financial situation and being away from his home when the job was offered, the intentions of which were to find a unlawful and unjustified means to claim that Mr. Calnimptewa was entitled to less amount of compensation that he was entitled based on fabricated claims that Mr. Calnimptewa refused light duty.

236.   This included the company playing doctor, telling Mr. Calnimptewa which doctors he could go to, communicating directly with the doctors that they chose and making their own unlawful interpretations of Mr. Calnimptewa's doctor notes and unlawfully having access to Mr. Calnimptewa's doctor notes causing additional pain and suffering fro Mr. Calnimptewa and his

ability to receive the actual medical attention he needed.

237.    **Count 12:** For attempting to get Mr. Calnimptewa to get an MRI in Idaho, including in Boise, Idaho, miles away from his home to save money so the company did not have to pay for the medical attention in California and for failing to schedule additional appointments for Mr. Calnimptewa thereafter to receive treatment after his MRI. For making Mr. Calnimptewa's MRI bill go to collection and for making Mr. Calnimptewa have to find his own doctor through his own means in having to travel to Arizona, miles away from his home, to obtain treatment and when he finally did receive treatment.

238.    **Count 13:** For unlawfully paying Mr. Calnimptewa his compensation months after it was due when they did pay him and for having the company pay Mr. Calnimptewa directly instead of from the insurance company.

239.    The intentional actions of which prolonged Mr. Calimntpewa's ability to receive surgery and recover and made his injury more severe with questions on whether or not he can return to work as a CDL driver. The actions of which made Mr. Calnimptewa destitie and lost his home, family, car, benefits, job and made him homeless and forced him to live off friends and family and the community. The actions of which made him suffer from severe emotional distress and were done intentionally or with reckless disregard for the truth as noted in the action for intentional infliction of emotional distress. The intentional actions was also a willful disregard for Mr. Calnimptewa and his health condition and his life, injuries, pain and physical and financial needs and requires a penalty fee through punitive damages for the reasons explained in this claim.

### ABUSE OF PROCESS

240.     The company never denied Mr. Calnimptewa's claim that he suffered a work-site injury. Mr. Calnimptewa should have only been required to file an action with the Department of Labor if there was a claim denial. They never denied he was suffering from pain. They never denied that he did not need physical therapy. Despite this, the company never paid Mr. Calnimptewa his weekly wage or salary or did not pay Mr. Calnimptewa his salary when they did in a timely manner.

241.     They never claimed that his injuries were not medically necessary. The failure to pay Mr. Calnimptewa his benefits forced Mr. Calnimptewa to have to file a claim with the Utah Labor Division to get the company to pay his benefits as he had no other recourse to get his benefits paid, the actions of which were an active part in the initiation of the action as a result of non-payment.

242.     The action of which was without a proper defense and instead from a fraudulent defense to claim that Mr. Calnimptewa denied light duty work offered to him as explained in the fraud section. He never talked to his doctor about light duty work. He never talked to the company about his pain and specific light duty jobs.

243.     The company never told him what light duty work  they were offering him upon inquiry. The company never listened to him when he told the company about his inability to work light duty. The company had the intent to terminate Mr. Calnimptewa before they even actually terminated him in light of the premature cancellation of his health benefits. This was without Mr. Calnimptewa knowing that the duties were under his job description.

244.     This was without his ability to work under his job description as light duty as a CDL driver as he could not work as a truck driver on an impaired limb under his job description

without federal medical clearance. The action of which was without a defense knowing that Mr. Calnimptewa had suffered from a work-site injury and as a result, without probable cause. The company, holding out to be an insurance company of their own that created a severe conflict of interest as noted in the fraud and breach of fiduciary claims, the actual intentions were to mitigate damages and liabilities owed toward Mr. Calnimptewa instead of properly assess and pay his claims.

245.     The actions of which were a wilful act and a means to coerce and mitigate damages owed to Mr. Calnimptewa. To drag-out the matter as to not pay any claims to him when he was in dire financial needs to do so to coerce Mr. Calnimptewa to settle to smaller amount in light of his injuries. It was also to mitigate any unknown liability toward Mr. Calnimptewa and to pay him in a lump sum as to not have any concern about any unknown liability toward him. This was improper and was intentionally and wilfully improper if the company knew that Mr. Calnimptewa suffered a work-site injury, then they were required to pay him his average weekly wage as it related to time-off work and they were required to allow him to bill worker's compensation. They were required to do this indefinitely until Mr. Calnimptewa recovered.

246.     The company paid Mr. Calnimptewa on two occasions, the payments of which were untimely when the payments were actually due and also indicating that the company knew they were liable toward Mr. Calnimptewa. They were the ones that dictated his doctor appointments and set-up his MRI. Despite this, they let the MRI go to collections. They did not allow him to bill for his surgery or for other medical visits he took in California. Despite this they subjected him to over a year of litigation as well as a deposition. He did not have any pre-existing conditions as to his knee and back that would have claimed that he did not suffer an injury when

he fell off the truck. He was able to drive and do his job prior to the injury.

247.    The company should-have paid Mr. Calnimptewa his average weekly wage from the start and his medical expenses. Mr. Calnimptewa should have never had to litigate the matter. He should have been paid for all the time off work and medical expenses related to his injury and covered for all of his time off work and medical expenses related to his injury.

248.    The company also, did not have the actual authority to deny or pay his claims as they were not an actual bonafide insurance company as explained in the fraud section. They also could not ethically review his claim as described in the breach of fiduciary duty section and the conflict of interest they had to mitigate liability toward Mr. Calnimptewa as the liable entity and as the insurance company and the actual conflict of interest that was created in this case. The action of which Mr. Calnimptewa had to commence against them was unlawful as a result.

249.    The actions were also unlawful as they were discriminated against Mr. Calnimptewa and his disability as explained in the disability section. The abuse of process cause of action described herein is also discriminatory against Mr. Calnimptewa and denying him his right of recover to his injuries of which he incorporates into the discrimination causes of action.

250.    The action of which subjected Mr. Calnimptewa to unnecessary pain and suffering, emotional distress, additional pain and injury to his knee, his inability to be properly compensated for his injury in a timely matter and have hsi medical expenses covered as such.

## VICARIOUS LIABILITY

251.    SWIFT is liable for physical harm caused by any of their employees or agents and Mr. Calnimptewa maintains that the actions alleged here occurred while the employees were in the course and scope of their employment, as Ms. Malkemus' duties were to supervise and oversee

and administer worker compensation claims with the company, and her actions were done with apparent or authorized authority, especially in light of the actual intent and purpose of Mohave as explained in the fraud section as well as all other agents that were involved in administering and determining Mr. Calnimptewa's claim, the fact that the company was wholly owned by SWIFT, and the fact that SWIFT determined the capital and amount they would payout as to liabilities, instead of having actual capital set aside as it related to each insurance policy, which was used to mitigate liabilities owed to claimants and was not an independent entity had the capital and means to act as an independent insurance company and was not designated as an insurance company with the FMSCA, the actions of which were done and least in part to benefit SWIFT, namely, to mitigate liabilities owed to claimants.

252.    Mr. Calnimptewa's supervisor also had the duties and authority as his supervisor to make threats to termination, to force him to drive to California and claim that the company would leave him stranded there this also includes when Mr. Calnimptewa talked to dispatch about his injury and he was told that he would be terminated if he would not do the load he committed to that he would be stranded in California with his injury, that he had to take a bus to return home, that he had to cancel his appointment with the doctor, the conversation made to Ms. Calnimptewa doctor, in attempting to claim that Mr. Calnimptewa could return to work despite his physical limitations and the failure to compensate him of his injuries in time, cancelling his health benefits, forcing him to get medical care where he was not located, forcing him to seek out and obtain his own medical care as well as all other claims contained in all other actions and under the factual section the actions and duties of which the employees were all duly authorized to do so.

253.    Or that the individuals had apparent authority to do so of which a reasonable person would have believed that they had such authorized duties and responsibilities as Mr. Calnimptewa supervisor and and Ms. Melkemus who was in charge of worker compensation claims, the actions were also at least in part to benefit the company as it related to handling of individual's medical claims and coordinating their benefits, and as to managing the company, its loads to and from locations for its clientele and customers and disciplining and reprimanding and giving advice to their employees as it related to those loads and any personnel issues from that employee in connection to that load. This is also in light of Ms. Melkanmus' actions and the company's intent and purpose to mitigate liability toward the company, indicating that the company authorized Ms. Melkemus to do what she did to mitigate liability owed toward Mr. Calnimptewa whether or not it was legal or ethical.

254.    Swift as the principal, is also liable for the harm caused by the actions described herein by its employees and by Mohave in that Swift exerted so much control over the manner through Ms. Melkemus and legal counsel and the supervisor as it relates to the claims alleged herein and had the ability to determine whether or not Mr. Calnimptewa should obtain benefits, the offer of light duty to him, whether or not he should be terminated and if his medical benefits should be terminated and what doctors he could attend. This is also in light of the financial control that Swift had over Mohave as explained in the fraud cause of action and Mohave did not act as an independent insurance claims company and instead as a mere agency for Swift in mitigating insurance liability claims for the company. *Mallory v. Brigham Young University,* 2012 UT App

255.    **Gallagher Bassett also is liable for the actions of their employees as they were authorized to determine liability as it related to Mr. Calnimptewa' worker compensation**

**claims** through Kim Bosler and payments and or had apparent authority to determine liability as it related to his worker compensation claims and payments as a reasonable person would have thought that the individuals that deprived Mr. Calnimptewa payments and had access to his file and documents, would have authority from the company to determine whether or not to deny or allow payments, the actions of which were at least in part as to the benefit of the company and as it related to their reviewing and denying or approving of claims.

256. The benefit of which was also to attempt to find a way to mitigate any liability and money owed to Mr. Calnimptewa and his injuries.

257. They are also liable for the actions of Melanie Malkemus who under the title of Work Injury Claims Examiner, acted as an agent with apparent authority, authorized by Gallagher Bassett to investigate and assess the work-injuries as is related to Mr. Calnimptewa and prepare a report and documents and findings to the company for their determination of payments.

258. This is also in light of the contractual relationship they had with Mohave insurance as either a third-party reinsurance entity as the company claimed to be an insurance company and as a result, Mohave acted with apparent or authorized authority to determine liability and risks and actions related to Ms. Malkemus. This was also done at least in part for the benefit of the company as they were also interested in mitigating risk and any liability owed toward Mr. Calnimptewa and approved of the actions, schemes, methods, conclusions, determinations, risks, payments, non-payments made by Mohave insurance.

**259.** **The actions of Swift with Gallagher Bassett in determining liability and mitigating liability** was also a joint venture of which the two entities relied on one another's agents in determining liability with the same purpose in determining liability for worker compensation

claims and assessing damages and liability for both entities and that the actions of Swift were authorized for the benefit of Gallagher Bassett acting with apparent authorized authority to work as a joint ventureship. This is in light of Swift claiming and holding out to have their own insurance company in determining liability for the company through Mohave and the active involvement of Ms. Malkemus throughout the claims process and holding out to be a claims adjuster.

## PUNITIVE DAMAGES

260.    As a result of the intentional and or reckless actions described in this complaint under assault and battery, breach of fiduciary duty, intentional infliction of emotional distress, intentional interference with economic relations, fraud abuse of process and discrimination Mr. Calnimptewa seeks punitive damages against the company as a result of what occurred in this event. Mr. Calnimptewa seeks punitive damages against the company as a result of the unneeded additional emotional and physically suffering from the intentional actions and to deter future occurrences from happening with other individuals and employees, the actions of which were wanton disregard for human life and health toward

261.    Mr. Calnimptewa as described in the complaint and the treatment toward Mr. Calnimptewa. He also seeks damages for the discrimination based on disability to the amount allowed under federal and Utah law or at least double the amount of actual damages. He also seeks damages at least three times the amount of actual damages for all other causes of action.

## DAMAGES

262.    Mr. Calnimptewa seeks damages for lost wages and benefits for the actions that occurred in this cause of action, past and future for the wrongful termination that occurred against Mr.

Calnimptewa in the amount Mr. Calnimptewa was making and receiving prior to his injury up to the age of retirement mitigated by any payment received from workers compensation his average wage was $1,188.85 a week not counting medical benefits and retirement. He seeks how much he should be receiving in retirement benefits but for the wrongful termination. The benefits of which are at least $1000 a month. At 58 years old, Mr. Calnimptewa had 9 years left to reach 67 years old for retirement. He was making $72,000 a year with his wage as a result of his weekly wage and would amount plus $12,000 a year in benefits or $84,000 in wages and benefits a year and would amount to $756,000 to the age of retirement.

263.    Mr. Calnimptewa seeks damages for medical expenses and and future incurred out of pocket past and future in relation to his knee injury and the additional damage that he incurred to his knee as a result of the actions of the company described in the complaint as well as for the emotional pain and suffering he has suffered past and future mitigated by any payments the company made by the company of at least $53,174.00 of actual expenses plus additional expenses for future medical expenses or $159,522.00.

264.    Mr. Calnimptewa seeks consequential damages past and future for what occurred including the loss of his home, the loss of his car, money borrowed from friends and family and organizations and the hospital and its reduced fees, including housing, cellphone use, money for food and other things past and future or at least $136,000.00 for past and $60,000.00 for each year in the future thereafter.

265.    As a result of what is alleged in the causes of action, Mr. Calnimptewa has suffered from actual physical pain from the actions of the company, emotional pain and exacerbated conditions as described in the complaint. Mr. Calnimptewa seeks damages at least four times the amount of

actual damages for pain and suffering past and future under the causes of action in this complaint, including loss of enjoyment of life, thoughts of suicide, severe depression, feelings of hopelessness and helplessness, fear, anxiety, anger, frustration and all other damages described in this complaint. The total actual damages being at least $1,051,522.00 and would be $4,206,088.00 or at least four times the amount of actual damages

266.    Mr. Calnimptewa seeks damages for loss of enjoyment of life as it relates to the additional, unnecessary, pain and suffering he suffered from with his injuries but for the claims alleged herein, in the amount of at least $360,000 for past loss and $130,000 each year for future losses.

267.    Mr. Calnimptewa seeks attorney fees to the extent authorized by law under the claims for disability discrimination and violation of the ERISA act. pursuant to 42 U.S. Code § 12205.

268.    Mr. Calnimptewa seeks punitive damages in the amount described in the section under punitive damages or $12,618.264.00 or at least three times the amount of actual damages.

269.    Mr. Calnimptewa seeks accrued interest as to the past and future damages. He also seeks the company to pay for any tax differences taxes that Mr. Calnimptewa might owe on obtaining an award for his damages as the damages would not have been paid to him yearly and are for different tax years but would be considered payment as if they were all in the same tax year for tax purposes, the actual amount he should have been paid during each year he should be entitled to.

## PRAYER FOR RELIEF

270.    Mr. Calnimptewa seeks a finding of liability under a preponderance of the evidence as described in the causes of action and factual section of this complaint.

271.    Mr. Calnimptewa seeks damages in the amount described in the sections under damages including punitive damages.

272.    Mr. Calnimptewa requests that a jury trial be issued to address the factual claims as applied to the legal claims in this matter.

273.    Mr. Calnimptewa seeks any other relief the court may deem due fit in this matter as justice so requires.

Respectfully submitted this 18th day of January, 2019


/s/ Brian K. Jackson
_____
Brian K. Jackson
Brian K. Jackson, LLC
Attorney for Michael Calnimptewa