## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| MICHAEL CALNIMPTEWA,<br><br>Plaintiff,<br><br>v.<br><br>SWIFT TRANSPORTATION and<br>MOHAVE TRANSPORTATION<br>INSURANCE COMPANY,<br><br>Defendants. | **MEMORANDUM DECISION<br>AND ORDER**<br><br>Case No. 2:19-cv-44<br><br>Howard C. Nielson, Jr.<br>United States District Judge |

Plaintiff Michael Calnimptewa sues Swift Transportation and Mohave Transportation Insurance Company.[1] Mr. Calnimptewa asserts claims under the Americans with Disabilities Act for disability discrimination, failure to accommodate, retaliation, and harassment. He also asserts a claim for age discrimination, presumably under the Age Discrimination in Employment Act. Mr. Calnimptewa initially asserted various state-law claims as well, but the court previously dismissed most, but not all, of these. Both sides now move for summary judgment. The court grants summary judgment for Defendants on all of Mr. Calnimptewa's federal claims and declines to exercise supplemental jurisdiction over his remaining state-law claims.

## I.

Mr. Calnimptewa worked as a long-haul truck driver for Swift. *See* Dkt. No. 74-6 at 17:25–18:6, 31:7–11. During this time, Mr. Calnimptewa lived in American Falls, Idaho. *See id.* at 9:5–14. On March 27, 2017, Mr. Calnimptewa was injured in Las Vegas after completing a

---

[1] Mr. Calnimptewa also named Gallagher Bassett as a defendant, but it has since been dismissed from the case. *See* Dkt. No. 72.

delivery. *See* Dkt. No. 74-17 at 2 ¶ 2. While Mr. Calnimptewa was sweeping out the trailer, the wind blew one of the trailer doors free. *See id.* The door swung and struck Mr. Calnimptewa, knocking him to the concrete. *See* Dkt. No. 74-6 at 28:6–10. Mr. Calnimptewa stated in his declaration that he then drove to a nearby truck stop to rest and get some pain medicine. *See* Dkt. No. 75-12 ¶¶ 2–3.

Mr. Calnimptewa was scheduled to pick up another load in Cedar City, Utah the next day. *See id.* ¶ 3; Dkt. No. 74-24 at 50:9–14. But he testified that he called the driver manager to explain what happened and asked to have the load reassigned to a different driver. *See* Dkt. No. 74-6 at 33:19–34:4. The driver manager stated that she would talk to the planner. *See id.* at 33:23–24. Mr. Calnimptewa testified that the planner later told him that he was "committed to it" and thus must take the load to California or face termination. *Id.* at 34:2–8, 34:13–19. And Mr. Calnimptewa stated in his declaration that he told his supervisor that he "thought [he] needed medical attention" but dispatch told him no. Dkt. No. 75-12 ¶ 3; *see also id.* at 36:18–22. Swift's claims representative, Melanie Malkemus, noted on March 28th that Mr. Calnimptewa told her that he "doesn't want medical care at this time," but "if that changes he will call" and that he felt "safe to continue working." Dkt. No. 77-2 at 5. In all events, Mr. Calnimptewa picked up the load in Cedar City and drove to California, though the drive took three days because his pain required him to make frequent stops. *See* Dkt. No. 74-24 at 50:12–51:17.

Mr. Calnimptewa testified that he called Ms. Malkemus while *en route* and reported that he was "really hurting big time" and that he "may have to use [his] insurance" for treatment. Dkt. No. 74-6 at 37:13–19. He testified that she "blew up." *Id.* at 37:20. Ms. Malkemus's internal notes from March 29th state that Mr. Calnimptewa called and explained that "his lumbar (back) is bothering him today and wanted to make mention of it. [She] advised [him] if he needs

medical care, to please let [her] know." Dkt. No. 77-2 at 2. She also noted that Mr. Calnimptewa

"would like to self-treat for a few days before making a decision" and that she would "refer him

to a clinic if need be" and check on him the next week. *Id.* Finally, she noted that Mr.

Calnimptewa "agreed to call if he wants/needs medical care." *Id.*

      Upon arriving at the Swift terminal in Lathrop, California on March 30th, Mr.

Calnimptewa visited San Joaquin General Hospital because "[i]t was already on the third day,

and [his] swelling was still pretty noticeable." Dkt. No. 74-24 at 51:18–52:16. Ms. Malkemus

noted the following day that Mr. Calnimptewa "went to hospital near Lathrop" and that he "was

there to treat for allergies" but "they saw [him] limping," and took "X-rays [of his]

back/knee/fore[arm]." Dkt. No. 77-3 at 2. According to Ms. Malkemus's notes, Mr.

Calnimptewa explained that "nothing was really done" and that he used his "health insurance for

this visit." *Id.* She advised him later that day that he was "going to need to seek medical care for

the injury . . . because he was evaluated at the ER" and she was "going to send him to US

Healthworks near Lathrop." *Id.* She noted that "[he] got upset and said [she] was not giving him

any choices" and he did not "want to go to the doctor in California." Dkt. No. 77-5 at 2. She

explained that before he could resume his work as a long-haul driver, Mr. Calnimptewa had to

either "provide a full duty release or write [her] a note advising he is not going to seek medical

care." *Id.* She represented that Mr. Calnimptewa ultimately agreed to go to the doctor. *See id.*

      That same day, Mr. Calnimptewa was seen by a doctor at the US Healthworks location in

Stockton, California. *See* Dkt. No. 77-4 at 2. He was diagnosed with "Left shoulder strain,"

"Contusion of left knee," "Lumbar strain," and "Contusion of right elbow." *Id.* The doctor

ordered physical therapy three times a week for two weeks and provided a work status report that

released Mr. Calnimptewa to work with restrictions that included "frequent change of position as

tolerated. No overhead work. Limited Lift, Limited Pull and Limited Push up to 10 lbs." *Id.* He

was required to wear back support and his next appointment was set for April 5, 2017. *See id.* He

also received a prescription for naproxen. *See* Dkt. No. 74-19 at 2.

After this doctor's visit, Mr. Calnimptewa called Ms. Malkemus and explained his

diagnosis and restrictions. *See* Dkt. No. 77-6 at 2. And because Mr. Calnimptewa was "not going

to be able to stay in the truck, per his work status [report]," Ms. Malkemus noted that he would

"need transportation home to Pocatello, ID." *Id.* She advised him that once she received the

doctor's work status report, she would "let the terminal know to place him on a WCLOA and to

provide transportation for [him] home." *Id.*[2] It is uncontested that Mr. Calnimptewa was then

placed on temporary total disability leave that would last until he received another work release.

Mr. Calnimptewa testified that Swift "couldn't help [him] out to find a place to stay" but

another driver allowed him to stay at his apartment nearby in Woodbridge, California, roughly

30 miles from the Swift terminal. Dkt. No. 74-24 at 52:17–53:2. He stayed there for

approximately ten days before his wife arrived in California and he relocated to his mother-in-

law's house, also in Woodbridge. *See id.* at 54:1–10.

Mr. Calnimptewa's efforts to return to Idaho are strongly disputed by the parties. He

testified that he wanted to return to Idaho and that Swift initially sent him a $150 advance for a

bus ticket, but then took the money "right back." *See* Dkt. No. 74-6 at 45:24–46:2. He also

testified that he declined the bus ticket because he had $3000 worth of valuables in his truck that

he could not take with him on the bus and that Swift would not allow him to store at the Lathrop

Terminal. *See id.* at 47:7–12; Dkt. No. 74-24 at 56:20–224. Mr. Calnimptewa further testified

---

[2] It appears from context that "WCLOA" stands for "Workers' Compensation Leave of Absence."

that because Swift refused to pay for him to rent a car and drive to Idaho, his wife drove to California so that she could drive him home. *See* Dkt. No. 74-6 at 48:5–12, 50:14–16. By contrast, Swift maintains that it repeatedly offered Mr. Calnimptewa funds for his bus fare and gas money for his wife to drive him home but ultimately recouped the funds after it became clear that Mr. Calnimptewa intended to remain in California. *See* Dkt. No. 77-10 at 2–7; Dkt. No. 77-13 at 2–3. Regardless, Mr. Calnimptewa did not return to Idaho until June when he received a $3000 disability payment. *See* Dkt. No. 74-6 at 96:8–10; Dkt. No. 74-24 at 64:25–65:3.

On May 1st, Mr. Calnimptewa had another evaluation at the US Healthworks location in Stockton. *See* Dkt. No. 77-8 at 156. The doctor's report stated that he had not improved significantly and provided the same diagnoses. *See id.* He was cleared to return to work with the following restrictions: "Limited gripping and grasping"; "Limited overhead work"; "Limited stooping and bending"; "Limited kneeling or squatting"; and "Limited Lift, Limited Push and Limited Pull up to 25 lbs." *Id.* The report stated that the doctor had discussed Mr. Calnimptewa's medical condition with Ms. Malkemus. *See id.* Mr. Calnimptewa received a third evaluation on May 9th, that resulted in essentially the same diagnoses and work restrictions. *See id.* at 163.[3]

Meanwhile, on May 5th, Lauranetta Williams, Swift's "Return to Work Coordinator" emailed the Lathrop Terminal Leader to arrange light-duty work for Mr. Calnimptewa. *See* Dkt. No. 77-21 at 2–3. She explained that Mr. Calnimptewa was "currently staying in California with family," as well as his work restrictions, consistent with the May 1st and 9th evaluations. *Id.* at 2. The Terminal Leader inquired where Mr. Calnimptewa was located and whether he would

---

[3] Mr. Calnimptewa also visited Lodi Memorial Hospital on April 17, 2017, and received a CT scan and a prescription for naproxen. *See* Dkt. No. 75-2 at 1–2. It appears that Swift paid for this treatment. *See* Dkt. No. 75-26 at 4.

provide his own transportation and lodging. *See id.* at 2. The Terminal Leader stated that he

would "put him in the same slot we had [for] Mr. Mendoza [who] just resigned." *Id.*

Swift's light-duty program includes multiple positions such as "greeter," "office

assistant," and "trailer locator"—among others. Dkt. No. 74-21 at 2 (cleaned up). Swift's Light

Duty Policies and Procedures document explains that "[i]f you travel to the terminal for light

duty it is your responsibility to notify the [representative] at the terminal" to arrange "bus tickets

and/or motel room arrangements." Dkt. No. 74-22 at 3. It also makes clear that "[f]ailure to work

the modified light duty position . . . may result in your separation with Swift Transportation." *Id.*

at 4. Ms. Williams stated in her declaration that Mr. Calnimptewa "would have been assigned to

work in one or more of these Light Duty Jobs and accommodations or adjustments would be

made, as necessary, once [he] reported for light duty work." Dkt. No. 74-23 ¶ 8.

Ms. Williams emailed Mr. Calnimptewa on May 9th, explaining that she had "been

attempting to contact [him] regarding the Light Duty program" and that she had "called and left a

message" but had not received a response. Dkt. No. 77-19 at 2. She requested that he call her

because it was "very important [she] get in contact with [him] in reference to the Light Duty

program." *Id.* She emailed him again the next day stating that she had been trying to reach him

"regarding the Light Duty program and possible placement at a Swift terminal" and that he

needed to contact her. *Id.* at 3. She also sent him a letter on May 10th, explaining that he had

been "released to light duty work status, and Swift Transportation ha[d] a temporary position

available" that comported "with the work restrictions established by [his] treating physician."

Dkt. No. 74-10 at 2. The letter noted her attempts to contact him and requested that he contact

her immediately to discuss the position and possible placement at a Swift terminal. *See id.*

Swift's counsel then emailed Plaintiff's counsel on May 11th and explained that a light duty position was available, and that Mr. Calnimptewa needed to contact Swift by May 13th. *See* Dkt. No. 74-12 at 2. Swift's counsel stated that failure to contact Swift by that date would result in Swift's assuming that Mr. Calnimptewa was "unwilling to perform the light duty employment" and terminating his total temporary disability payments. *Id.*

Ms. Williams sent another letter to Mr. Calnimptewa on May 22nd—copying his counsel. *See* Dkt. No. 74-13 at 2. She explained that Swift had a temporary position that comported with Mr. Calnimptewa's work restrictions. *See id.* But Ms. Williams noted that she had been "unsuccessful in contacting" Mr. Calnimptewa and that she would "proceed in removing [him] from the Light Duty Program as this could possibly affect [his] employment with Swift Transportation." *Id.* Finally, she explained that "[c]ompany policy states that 3 consecutive days in which an employee fails to contact their supervisor and/or report to work is considered a voluntary resignation by the employee." *Id.*

On May 31, 2017, Ms. Williams sent Mr. Calnimptewa a letter by certified mail stating that she would "proceed a separation of employment with Swift Transportation as of June 1, 2017." Dkt. No. 74-15 at 2. She explained that "[p]er Swift policy failure to work the modified light duty position provided, known as 'No Call No Show' or lack of communication may result in . . . separation of employment with Swift." *Id.* She further explained that Mr. Calnimptewa had been released to transitional light duty, he was expected to adhere to "Swift policies and procedures regarding attendance, timeliness, productivity, communication etc.," and that despite several attempts by email and phone to make contact with him and his attorney, Swift had received no response. *Id.*

Mr. Calnimptewa filed a charge of discrimination with the Utah Anti-Discrimination and Labor Division on August 7, 2017, alleging disability discrimination and retaliation. *See* Dkt. No. 74-27. Mr. Calnimptewa also brought a worker's compensation claim against Swift. *See* Dkt. No. 12 ¶ 24. Mr. Calnimptewa and Swift settled this claim in June 2018, and Mr. Calnimptewa released all claims against Swift that arose from his worksite injury. *See* Dkt. No. 74-17.[4]

Mr. Calnimptewa then brought this action on January 18, 2019. *See* Dkt. No. 2.

## II.

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A fact is material if it "might affect the outcome of the suit under the governing law"; a "dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255

The nonmovant must "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citation omitted). "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

---

[4] The court previously interpreted the release signed by Mr. Calnimptewa to bar all relief that Mr. Calnimptewa could have received as benefits under the Workers' Compensation Act, including "Loss received on account of his injury," "Medical, nurse, and hospital services," "Medicines," "Physical, mental, or emotional injuries related to mental stress arising out of and in the course of employment," and "Two-thirds of his average weekly wages at the time of injury." Dkt. No. 67 at 5:23–6:23; *see also* Dkt. No. 63.

### III.

Mr. Calnimptewa asserts a variety of claims under the Americans with Disability Act. The court addresses each in turn.

### A.

The court begins with Mr. Calnimptewa's disability discrimination claim. Such claims are evaluated using the *McDonnell-Douglas* burden-shifting framework. *See Dewitt v. Southwestern Bell Tel. Co.*, 845 F.3d 1299, 1306 (10th Cir. 2017). Under this framework, the plaintiff must first establish a *prima facie* case of discrimination. *See id.* at 1307. If the plaintiff satisfies this initial burden, "the defendant employer must offer a legitimate non-discriminatory reason for the adverse employment action." *Id.* (cleaned up). "The burden then shifts back to the plaintiff who must show there is at least a genuine issue of material fact as to whether the employer's proffered legitimate reason is genuine or pretextual." *Id.* (cleaned up).

"The plaintiff may establish pretext by showing 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'" *Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1267 (10th Cir. 2015) (quoting *Jones v. Oklahoma City Pub. Schs.*, 617 F.3d 1273, 1280 (10th Cir. 2010)). The court may consider the plaintiff's *prima facie* case in connection with evidence that the employer's justification was false to determine whether a genuine dispute of material fact exists regarding discriminatory intent. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000).

The ADA prohibits employers from discriminating against "a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). "To establish a prima facie case of discrimination

under the ADA, an employee must show: (1) she is disabled within the meaning of the ADA; (2) she is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) she was discriminated against because of her disability." *Mason v. Avaya Commc'ns, Inc.*, 357 F.3d 1114, 1118 (10th Cir. 2004). Establishing a *prima facie* case is "not onerous." *Hawkins v. Schwan's Home Serv., Inc.*, 778 F.3d 877, 883 (10th Cir. 2015) (quoting *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005)).

The Tenth Circuit "liberally defines the phrase 'adverse employment action'" and it is not "limited to monetary losses in the form of wages or benefits." *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 532 (10th Cir. 1998). Instead, the court must "take a 'case-by-case approach,' examining the unique factors relevant to the situation at hand." *Id.* An adverse action includes a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Hillig v. Rumsfeld*, 381 F.3d 1028, 1032–33 (10th Cir. 2004) (cleaned up). It does not follow, however, that "a mere inconvenience or an alteration of job responsibilities [is] an adverse employment action." *Sanchez*, 164 F.3d at 532 (cleaned up).

Most of what Mr. Calnimptewa challenges as discrimination is not cognizable under the ADA. For example, Mr. Calnimptewa argues that Swift discriminated against him by not allowing him to see a doctor in Las Vegas and by threatening to fire him if he did not drive to California; by telling him to cancel some of his doctors' appointments and dictating others; by requiring him to ride a bus home to Idaho; by delaying his follow up visit to a doctor for a month and not allowing him to attend physical therapy; by forcing him to go to the emergency room using his health insurance; by influencing his medical care by speaking with his doctor; by failing to communicate directly with him regarding his ability to perform light duty work; by

requiring him to get an MRI in Boise, Idaho; and by failing to pay some of his medical expenses. *See* Dkt. No. 62 ¶¶ 115–21, 126–27, 129, 132.[5]

The court concludes that none of these alleged adverse actions constitute cognizable disability discrimination. As a preliminary matter, Mr. Calnimptewa's contention that Swift did not pay for certain medical expenses relating to his injury are barred by the settlement agreement as construed in the court's prior ruling. What is more, the record is clear that Mr. Calnimptewa was granted a leave of absence and total temporary disability benefits until he was cleared to resume work. Nearly all of the remaining adverse actions alleged by Mr. Calnimptewa are more fairly categorized as complaints that he did not receive *additional* benefits. For example, Mr. Calnimptewa's desired form of transportation back to Idaho constitutes an additional benefit that Mr. Calnimptewa sought to receive after he was injured. It follows that Swift's arrangements for Mr. Calnimptewa's transportation home cannot constitute "adverse action" under the ADA—Mr. Calnimptewa was not deprived of anything he had. And Mr. Calnimptewa's contentions relating to his doctor's visits and medical care involve Swift's handling of his worksite injury. The court cannot conclude that Swift's methods and behavior as it handled the injury constitutes a "significant change in benefits" that is actionable under the ADA.

Mr. Calnimptewa does make a *prima facie* case of discrimination with respect to the termination of his employment, however. *See* Dkt. No. 62 ¶ 133. This undoubtedly constitutes cognizable adverse action and Swift does not contest that Mr. Calnimptewa was disabled when it terminated him. Although Swift argues that Mr. Calnimptewa could not perform the essential

---

[5] Mr. Calnimptewa also alleges that Swift canceled his health insurance. *See* Dkt. No. 62 ¶¶ 137, 141, 156, 160. While this could constitute an adverse employment action, Mr. Calnimptewa alleges this "count" only in relation to his claims for retaliation and failure to accommodate. *See id.* ¶¶ 134–42, 153–60.

functions of his job because he could not—and indeed still cannot—work as a licensed commercial driver when Swift terminated him, *see* Dkt. No. 74-6 at 8:1–9:4, it is plausible that Mr. Calnimptewa could have regained his ability to perform his job with a reasonable accommodation (such as light duty work) that would have allowed him time to recover. Swift, however, has offered a nondiscriminatory justification for the termination: Mr. Calnimptewa violated Swift's attendance and reporting policy by neglecting to communicate with Swift after he was released to light duty work. Swift's "Attendance and Service Failures" policy in the driver manual, which Mr. Calnimptewa acknowledged he had read, *see* Dkt. No. 74-1 at 2, states that if he "fail[ed] to report for work without any notification to [his] Driver Leader, [he] may be considered to have abandoned [his] employment with the Company," *see* Dkt. No. 74-14 at 3. What is more, the May 22nd letter specifically warned him that "3 consecutive days in which an employee fails to contact their supervisor and/or report to work is considered a voluntary resignation by the employee." Dkt. No. 74-13 at 2.

Although Mr. Calnimptewa asserts that he tried to call Ms. Williams twice, he offers no documentary evidence of this—such as phone records—nor does he explain his failure to reply to her emails. The evidence that he does offer, however, is that Swift told Mr. Calnimptewa that because he had counsel, communication needed to occur through his lawyer. *See* Dkt. No. 75-12 ¶ 18; Dkt. No. 74-6 at 55:22–24, 57:8–10. Mr. Calnimptewa also stated in his declaration that he left a voicemail for Ms. Williams, but this did not occur until May 24th, *after* Swift notified him that his failure to respond violated company policy. *See* Dkt. No. 75-12 ¶ 18. And although Mr. Calnimptewa testified that his counsel told him that he contacted Swift, *see* Dkt. No. 74-24 at 64:4–10, the record indicates that these communications occurred *before* Swift reached out regarding light duty, *see* Dkt. No. 77-16 at 2–3, and *after* Mr. Calnimptewa was already

terminated, *see* Dkt. No. 75-12 ¶ 20. In all events, Mr. Calnimptewa has not identified any evidence that could be admitted at trial that this occurred because his attorney cannot testify as a witness. *See* UCJA Rule 13-3.7; *Adams v. American Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) ("Hearsay testimony that would be inadmissible at trial cannot be used to defeat a motion for summary judgment."). More fundamentally, Swift spent nearly a month attempting to contact Mr. Calnimptewa—far longer than the three consecutive days of noncommunication prohibited by company policy. Swift's decision to terminate Mr. Calnimptewa was thus justified on nondiscriminatory grounds after he was released to work with restrictions but failed to communicate with his supervisors or report to work.

Mr. Calnimptewa has failed to carry his burden of identifying evidence that could support a reasonable jury's finding that Swift's asserted justification was pretextual. Instead, the record evidence indicates that Swift repeatedly tried to contact him—both directly and through his lawyer—to discuss light duty options. Mr. Calnimptewa has not pointed to any evidence suggesting that Swift's decision was actually motivated by something other than his failure to return to work or communicate with the company.

Mr. Calnimptewa also makes a *prima facie* showing of discrimination with respect to Swift's light-duty work requirement because it would have resulted in a significant change in his job responsibilities. But again, Swift offered a nondiscriminatory rationale for this decision: Mr. Calnimptewa's work restrictions prohibited him from immediately returning to his original position and Swift's policies make clear that after employees have been released to "transitional light duty," they "are expected to adhere to Swift policies and procedures regarding attendance, timeliness, and productivity." Dkt. No. 74-22 at 2. Although Mr. Calnimptewa alleges that Swift's decision to require him to perform light-duty work was a pretext to justify ending his

13

temporary disability benefits, he cannot dispute that two medical evaluations cleared him for light-duty work or the existence or terms of Swift's light-duty work requirement.[6]

For all of these reasons, Mr. Calnimptewa has failed to identify any genuine disputes of material fact that would foreclose summary judgment for Defendants on his disability discrimination claim.

## B.

The court next addresses Mr. Calnimptewa's claim that Swift failed to accommodate his disability. An employer violates the ADA by failing to "make[] reasonable accommodations to the known physical or mental disabilities of an otherwise qualified individual with a disability" unless such accommodation would pose an "undue hardship" on the employer. 42 U.S.C. § 12112(b)(5)(A). "Unlike a disparate-treatment claim, a failure-to-accommodate claim does not require proof of a discriminatory animus—any failure to provide reasonable accommodations to an otherwise qualified individual will be sufficient." *Edmonds-Radford v. Southwest Airlines Co.*, 17 F.4th 975, 992 (10th Cir. 2021).

"Under the Tenth Circuit's modified burden-shifting framework for failure-to-accommodate claims," Mr. Calnimptewa must first make out a *prima facie* case that he "(1) is disabled, (2) is otherwise qualified, and (3) requested a plausibly reasonable accommodation." *Id.* (footnote omitted). "The burden then shifts to [the employer] to either rebut one or more elements of [the plaintiff's] prima facie case, or establish an affirmative defense." *Id.* "If [the employer] does so, the burden shifts back to [the plaintiff] to present evidence establishing a

---

[6] Mr. Calnimptewa asserts that he was forced to deliver the load to California or face termination. While termination is certainly an adverse action, Mr. Calnimptewa identifies no evidence that Swift knew that Mr. Calnimptewa was disabled at the time it insisted that he complete this assignment.

genuine dispute as to the affirmative defenses or as to the challenged elements of her prima facie case." *Id.*

The statute defines "reasonable accommodation" to include: "making existing facilities used by employees readily accessible to and usable by individuals with disabilities" and "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9). "[T]he term 'reasonable accommodation' refers to those accommodations which presently, or in the near future, enable the employee to perform the essential functions of his job." *Lincoln v. BNSF Ry. Co.*, 900 F.3d 1166, 1205 (10th Cir. 2018) (cleaned up).

Mr. Calnimptewa alleges that Swift failed to accommodate him by not allowing him to attend follow-up doctor's appointments and physical therapy, by requiring him to take a bus home, by canceling his health insurance, by failing to provide him worker's compensation insurance information, and by billing him for medical care. *See* Dkt. No. 62 ¶¶ 154–57, 159–60.[7]

But "before an employer's duty to provide reasonable accommodations—or even to participate in the 'interactive process'—is triggered under the ADA, the employee must make an adequate request, thereby putting the employer on notice." *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1049 (10th Cir. 2011). And regardless of his arguments and allegations, Mr. Calnimptewa points to no actual *evidence* that he made an adequate request for most of these

---

[7] Mr. Calnimptewa also appears to argue that Swift failed to accommodate him by not allowing him to take his full twelve weeks of FMLA leave. But these allegations are not contained in the amended complaint and Mr. Calnimptewa identifies no evidence that he requested and was denied FMLA leave in all events. The court accordingly rejects this argument.

supposed accommodations. For example, he argues that Swift failed to accommodate him when it did not allow him to seek medical attention in Las Vegas. But Mr. Calnimptewa has not identified any evidence that he actually made this request. Instead, his deposition testimony indicates that he requested to be taken off the load, to stay in the truck, to store his equipment in the terminal, and for help returning home. *See* Dkt. No. 74-6 at 25:17–18, 27:5–6, 27:13–19, 34:3–5; Dkt. No. 74-24 at 54:24 – 55:9. More fundamentally, Mr. Calnimptewa points to no evidence demonstrating that Swift knew he had a disability at this time. Rather, he testified that he conveyed to his supervisor that he was injured but had not received any diagnosis. *See* Dkt. No. 74-6 at 33:19–34:12. Mr. Calnimptewa offers no authority that a request made under such circumstances constitutes a request for an accommodation within the meaning of the ADA.

What is more, most of what Mr. Calnimptewa appears to have desired do not constitute "accommodations" under the ADA. For example, although the Tenth Circuit has repeatedly held that "under the appropriate circumstances, an allowance of time for medical care or treatment may constitute a reasonable accommodation," *C.R. England,* 644 F.3d at 1048 (cleaned up), Mr. Calnimptewa cites no authority that medical care itself constitutes an accommodation. And even had Mr. Calnimptewa conveyed to Swift his objection to a light duty assignment, that would have at most amounted to a request that his temporary disability leave be extended until Mr. Calnimptewa believed he was ready to return to work. But "indefinite unpaid leave is not a reasonable accommodation where the plaintiff fails to present evidence of the expected duration of [his] impairment." *Rascon v. US W. Commc'ns, Inc.*, 143 F.3d 1324, 1334 (10th Cir. 1998), *overruled on other grounds by New Hampshire v. Maine,* 532 U.S. 742 (2001). The court has little difficulty concluding that the same is *a fortiori* true of indefinite leave plus short-term disability payments—which appears to be what Mr. Calnimptewa desired. As for whatever Mr.

Calnimptewa may have requested regarding using his health insurance, obtaining information about worker's compensation insurance, timing his benefits checks, storing his personal belongings at the Swift terminal, and traveling home, these are not accommodations that would enable him "to perform the essential functions of his job." Rather, Mr. Calnimptewa sought various benefits related to his worksite injury. Finally, to the extent Mr. Calnimptewa's claim rests on his allegation that Swift failed to pay for all of his medical care, it is barred by the release he signed.[8]

Because Mr. Calnimptewa has thus failed to identify any evidence that he adequately requested a cognizable accommodation, the court grants summary judgment in Defendants' favor on this claim.

## C.

The court turns next to Mr. Calnimptewa's claim for retaliation. To state a *prima facie* case of retaliation under the ADA, the plaintiff must demonstrate "(1) that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1208 (10th Cir. 2007) (cleaned up).

---

[8] Mr. Calnimptewa also argues that Swift failed to accommodate him by scheduling an MRI in Boise when he did not have the means to get there. Again, it is not clear what if anything he actually requested and an MRI at a convenient location is likely not a cognizable accommodation in all events. Regardless, Mr. Calnimptewa's evidence does not make clear who actually scheduled the Boise MRI: Swift, Gallagher Bassett (the dismissed defendant), or the health provider. *See* Dkt. No. 74-6 at 96:2–7. What is more, Mr. Calnimptewa testified that Swift or Gallagher Bassett then rescheduled the appointment in Pocatello, Idaho, where Mr. Calnimptewa apparently received an MRI. *Id.* at 96:8–17. The court cannot conclude that any inconvenience or delay associated with this scheduling and subsequent rescheduling constitutes a cognizable failure to accommodate.

Mr. Calnimptewa contends that Swift retaliated against him for reporting a worksite injury and attempting to obtain workers' compensation benefits by forcing him to drive to California, by forcing him to use his own health insurance to obtain medical care, by telling him to cancel his medical appointments, by failing to provide him transportation back to Idaho, and by not paying for his medical expenses. *See* Dkt. No. 62 ¶¶ 134–37, 140–42.

But filing a worker's compensation claim and reporting a worksite injury are not protected acts under the ADA—though they can be protected by state law. *See Sanjuan v. IBP, Inc.*, 275 F.3d 1290, 1294 (10th Cir. 2002). It follows that even if Swift took the actions of which Mr. Calnimptewa complains in retaliation for his reporting his injury and filing a worker's compensation claim, these actions do not constitute actionable retaliation under the ADA. Likewise, while Mr. Calnimptewa also argues that his requests for accommodation provoked Swift's retaliation, as already explained, he did not actually request any cognizable accommodations. And "an inadequate request for an accommodation—one that does not trigger an employer's duty to provide a reasonable accommodation or participate in the 'interactive process' of finding an appropriate accommodation—can never constitute protected activity." *Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1188 (10th Cir. 2016).

Finally, Mr. Calnimptewa argues that Swift retaliated against him for filing an EEOC complaint. But although filing an EEOC complaint "indisputably" constitutes protected activity, *id.* at 1187–88, Mr. Calnimptewa does not identify any adverse action relating to his employment that Swift took after he filed the EEOC complaint—to the contrary, by that point his employment had already been terminated, *see* Dkt. No. 74-27.

18

Because Mr. Calnimptewa has thus failed to identify evidence that would establish a *prima facie* case of retaliation, the court grants Defendants' motion for summary judgment on his retaliation claim.

### D.

Mr. Calnimptewa's final ADA claim is for harassment. To survive summary judgment on such a claim, a plaintiff "must show that a rational jury could find that the workplace [was] permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Penry v. Federal Home Loan Bank of Topeka*, 155 F.3d 1257, 1261 (10th Cir. 1998) (cleaned up). "General harassment alone is not actionable." *Williams v. FedEx Corp. Servs.*, 849 F.3d 889, 897 (10th Cir. 2017). To determine whether a plaintiff has made the required showing, the court must "look to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002) (cleaned up).

Mr. Calnimptewa contends that "he was subjected to unwelcome and unwanted behavior based on his disability and the harassment was sufficiently severe to alter the terms and conditions of his employment as it related to his right for worker's compensation benefits, his right to health benefits, his right to choose the doctor of his own choice in light of his injury and his right to be free from workplace harassment." Dkt. No. 62 ¶ 143. Specifically, he maintains that he was harassed when he was threatened with termination if he did not take his load to California, when he was told to cancel his doctor appointments and when his medical benefits

were not paid, when he was told to take the bus back to Idaho, when Ms. Malkemus spoke with his doctor, when Swift terminated his medical benefits prior to his termination, when Swift did not provide worker's compensation benefits, and when Swift "claimed he could work light duty and continued to send letters claiming that he was not communicating with the company which were false which led to his ultimate termination based on the 'No call no Show' policy." *Id.* ¶¶ 145–52.

But Mr. Calnimptewa identifies no evidence that he was subject to any actionable harassment under the ADA. Instead, he merely repackages his allegations relating to various actions taken or omissions made by Swift in addressing his worksite injury. Crucially, he does not explain how these actions constitute harassment or cite any authority treating comparable actions as harassment. Nor does Mr. Calnimptewa point to evidence that his workplace was "permeated with discriminatory intimidation, ridicule, and insult" that related to his disability. *Penry*, 155 F.3d at 1261. To be sure, Mr. Calnimptewa argues that Swift's requiring him to complete his job after he was injured constituted discriminatory intimidation. But again, Mr. Calnimptewa identifies no evidence that Swift knew he was disabled at this time—meaning the intimidation (if there was any) was not *discriminatory*.

Defendants' motion for summary judgment on this claim is granted.

## IV.

Mr. Calnimptewa also asserts a claim of age discrimination, presumably under the Age Discrimination in Employment Act. Mr. Calnimptewa contends that he was discriminated against based on his age because Swift "attempted to fraudulently mitigate liability towards [him]." Dkt. No. 62 ¶ 161. Specifically, he alleges that "[i]f [he] was a younger driver, the scrutiny and unlawful oversight to his injury would not have occurred." *Id.* He also challenges

Swift's handling of his worker's compensation claim and contends that "he was released to do light duty without doctors' authorization as to the duties, without Mr. Calnimptewa and his improvement from his injury prior, without noting how that would accommodate Mr. Calnimptewa with his knee injury." *Id.* ¶ 162.

To prevail on an ADEA age discrimination claim, "a plaintiff bears the ultimate burden of proving her employer intentionally discriminated against her." *Bennett*, 792 F.3d at 1266. When circumstantial evidence is used to create an inference of intentional discrimination, the court evaluates the claim under the *McDonnell-Douglas* framework. *See id.* To make out a *prima facie* case, the plaintiff must show by a preponderance of the evidence that: (1) "she is a member of a protected class," (2) "she suffered an adverse employment action," and (3) "the challenged action occurred under circumstances giving rise to an inference of discrimination." *Id.* (footnote omitted). While these requirements "are neither rigid nor mechanistic, their purpose is the establishment of an initial inference of unlawful discrimination warranting a presumption of liability in plaintiff's favor." *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1146 (10th Cir. 2008).

As already explained, many of Swift's actions and omissions of which Mr. Calnimptewa complains do not amount to "adverse employment action." And while Mr. Calnimptewa's termination and light duty assignment do constitute adverse employment actions, Mr. Calnimptewa has not identified any evidence that the circumstances of his termination or light duty assignment in any way related to his age or otherwise give "rise to an inference of discrimination." *Bennett*, 792 F.3d at 1266. Rather, Mr. Calnimptewa received two medical work releases clearing him to perform light work but failed to respond in a timely fashion to Swift's repeated attempts to communicate with him regarding a light duty assignment, as Swift's policies

required. Mr. Calnimptewa has also failed to provide the type of evidence necessary to support a disparate impact claim. Rather, the crux of Mr. Calnimptewa's claims relate to Swift's handling of his worker's compensation claim.

The court accordingly grants summary judgment in Defendants' favor on this claim.

**V.**

"The Tenth Circuit has explained that when all federal claims have been dismissed, the court may, and usually should, decline to exercise supplemental jurisdiction over any remaining state-law claims." *Reyes v. N.A.R. Inc.*, 546 F. Supp. 3d 1031, 1042 (D. Utah 2021) (cleaned up); *see also* 28 U.S.C § 1367(c)(3). Because the court has determined that the Defendants are entitled to summary judgment on all of Mr. Calnimptewa's federal claims, it will follow the Tenth Circuit's guidance and dismiss Mr. Calnimptewa's remaining state-law claims without prejudice.[9]

\*     \*     \*

For these reasons, summary judgment is **GRANTED** in favor of Defendants on Mr. Calnimptewa's federal claims. Mr. Calnimptewa's remaining state-law claims will be dismissed without prejudice.

**IT IS SO ORDERED.**

DATED this 30th day of March, 2023.

_____
Howard C. Nielson, Jr.
United States District Judge

---

[9] Mr. Calnimptewa alleges that he "currently resides in Phoenix, Arizona with the intent to permanently stay there," that Defendant Swift Transportation is "a Delaware Corporation . . . whose headquarters are located in . . . Phoenix, AZ," and that Defendant Mohave Transportation Insurance Company is "an Arizona corporation." Dkt. No. 62 ¶¶ 1–3. Given the lack of diversity of citizenship, the court lacks independent jurisdiction over Mr. Calnimptewa's state-law claims.